Case No. 15-15355

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

TIM FUHR,
*Applicant-Appellee,*

v.

CREDIT SUISSE AG,
*Respondent-Appellant,*

DEUTSCHE BANK, AG,
*Respondent.*

---

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:13-mc-21598-ZLOCH/HUNT

---

## BRIEF OF APPELLANT CREDIT SUISSE AG

---

BRUCE J. BERMAN
THOMAS J. MEEKS
CARLTON FIELDS JORDEN BURT, P.A.
100 Southeast Second Street, Suite 4200
Miami, Florida 33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Counsel for Respondent-Appellant
Credit Suisse AG*

# TABLE OF CONTENTS

*Page*

TABLE OF CITATIONS ........................................................................ iv

CERTIFICATE OF INTERESTED PERSONS ...................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................C-2

STATEMENT REGARDING ORAL ARGUMENT ..............................1

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ............................................................................2

INTRODUCTION .................................................................................3

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............6

STATEMENT OF THE CASE AND FACTS ........................................7

    A.    THE COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE COURT BELOW ........................................................7

    B.    STATEMENT OF THE FACTS.........................................11

    C.    STATEMENT OF THE STANDARD OF REVIEW FOR EACH CONTENTION ........................................................15

SUMMARY OF THE ARGUMENT ...................................................17

ARGUMENT .......................................................................................20

I.    THE DISTRICT COURT ERRED IN ORDERING DISCOVERY OUTSIDE THE TERRITORIAL SCOPE OF SECTION 1782 .............20

A.    Section 1782 Was Never Intended To Provide For The Discovery Of Documents Located Outside Of The United States. ........................................................................20

B.    Section 1782's Lack Of Extraterritorial Application Is Supported By Sound Policy Considerations. ...............................23

C.    Potential Electronic Access to Documents Located Outside the United States Cannot Alter The Proper Interpretation Of § 1782. ...........................................................................26

II.    EVEN IF § 1782 APPLIED, THE DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING ASSISTANCE WHERE THE RECORD SO CLEARLY DEMONSTRATED A CONCEALED ATTEMPT TO CIRCUMVENT FOREIGN PROOF-GATHERING REQUIREMENTS ...........................................33

III.    EVEN IF § 1782 APPLIED, THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO CONDUCT AN INTERNATIONAL COMITY ANALYSIS ...........................................39

CONCLUSION ......................................................................................41

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ...........................................................................433

CERTIFICATE OF SERVICE ...............................................................444

iii

## <u>TABLE OF CITATIONS</u>

<em>Page</em>

## <u>Cases</u>

*Chevron Corp. v. Doziger,*

　296 F.R.D. 168 (S.D.N.Y. 2013) ..................................................................40

\*Fuhr v. Deutsche Bank, AG,*

　615 F. App'x 699 (2d Cir. 2015) ..................................................................29

*Glock v. Glock, Inc.,*

　797 F.3d 1002 (11th Cir. 2015) ........................................................ 16, 17, 38

*Gucci America, Inc. v. Weixing Li,*

　768 F.3d 122 (2d Cir. 2014) ........................................................................40

*Highmark Inc. v. Allcare Health Management System, Inc.,*

　134 S. Ct. 1744 (2014) ............................................................................ 16, 39

\*In re Application of Fuhr,*

　No. 1:13-cv-06753, D.E. 33 (S.D.N.Y. Aug. 6, 2014). ...................................29

*In re Application of Gianoli Aldunate,*

　3 F.3d 54 (2d Cir. 1993) .......................................................................... 16, 38

\*In re Application of Sarrio, S.A.,*

　119 F.3d 143 (2d Cir. 1997) ............................................................... 21, 22, 24

*In re Chevron Corp.*,

    650 F.3d 276 (3d Cir. 2011) .................................................................2

*In re Godfrey*,

    526 F. Supp. 2d 417 (S.D.N.Y. 2007) ........................................ 21, 29

*\*In re Grupo Unidos Por El Canal, S.A.*,

    2015 WL 1810135 (D. Colo. Apr. 17, 2015) ............................ 22, 31

*In re IPC Do Nordeste, LTDA*,

    2012 WL 4448886 (E.D. Mich. Sept. 25, 2012) ..............................35

*\*In re Kreke Immobilien KG*,

    2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013)........................... *passim*

*In re Microsoft Corp.*,

    428 F. Supp. 2d 188 (S.D.N.Y. 2006) .................................. 22, 23, 35

*In re Republic of Ecuador*,

    735 F.3d 1179 (10th Cir. 2013) ..........................................................2

*Intel Corp. v. Advanced Micro Devices, Inc.*,

    542 U.S. 241, 124 S. Ct. 2466 (2004) ............................ 16, 25, 32, 33

*Kestrel Coal Pty. Ltd. v. Joy Global, Inc.*,

    362 F.3d 401 (7th Cir. 2004) ............................................................31

*Kiobel v. Royal Dutch Petroleum Co.*,

    133 S. Ct. 1659 (2013)............................................................... 23, 24

*Linde v. Arab Bank, PLC*,

    706 F.3d 92 (2d Cir. 2013) ................................................................39

*Minpeco, S.A. v. Conticommodity Services, Inc.*,

    118 F.R.D. 331 (S.D.N.Y. 1988) ......................................................41

*Minpeco, S.A. v. Conticommodity Services, Inc.*,

    116 F.R.D. 517 (S.D.N.Y. 1987) ............................................... 34, 39

*Motorola Credit Corp. v. Uzan*,

    73 F. Supp. 3d 397 (S.D.N.Y. 2014) .......................................... 34, 41

*Norex Petroleum Ltd. v. Chubb Insurance Co. of Canada*,

    384 F. Supp. 2d 45 (D.D.C. 2005) .............................................. 22, 23

*Perforaciones Exploración y Produccion v. Maritimas Mexicanas, S.A. de C.V.*,

    356 F. App'x 675 (5th Cir. 2009) ......................................................17

*S.E.C. v. Stanford International Bank, Ltd.*,

    776 F. Supp. 2d 323 (N.D. Tex. 2011) ............................................40

*Singleton v. Wulff*,

    428 U.S. 106, 96 S. Ct. 2868 (1976) ...............................................38

*Societe Internationale Pour Participations Industrielles*

    *Et Commerciales, S.A. v. Rogers*,

    357 U.S. 197, 78 S. Ct. 1087 (1958) ................................................39

*Société Nationale Industrielle Aérospatiale v. U.S. District Court*,

    482 U.S. 522, 107 S. Ct. 2542 (1987) ...............................................39

*United Kingdom v. United States*,

    238 F.3d 1312 (11th Cir. 2001) .......................................................17

## Statutes

28 U.S.C. § 1782 ............................................................................ *passim*

## Other Authorities

*Hans Smit, *American Assistance to Litigation in Foreign & International*

    *Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited*,

    25 Syracuse J. Int'l L. & Com. 1, 11 (1998) ....................................... 21, 24, 25

S. Rep. No. 1580, 88th Cong., 2nd Sess. (1964) .....................................22

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fed.R.App.P. 26.1 and 11th Cir. Rules 26.1-1 – 26.1-3, Respondent/Appellant, Credit Suisse AG ("Credit Suisse"), certifies that the following are persons and entities have an interest in the outcome of this appeal:

1. Berman, Bruce J. – Counsel for Credit Suisse

2. Carlton Fields Jorden Burt, P.A. – Counsel for Credit Suisse

3. Clabby, John E. – Counsel for Credit Suisse

4. Credit Suisse AG – Respondent and Appellant

5. Credit Suisse Group AG – Parent of Credit Suisse (NYSE: CS; SIX: CSGN)

6. Donaghy Lowy LLC – Former Counsel for Tim Fuhr

7. Felix, Adrian K. – Counsel for Credit Suisse

8. Fuhr, Tim – Petitioner and Appellee

9. Hunt, Patrick M. – Magistrate Judge, United States District Court for the Southern District of Florida

10. Lowy, James F. – Former Counsel for Tim Fuhr

11. Luck, David L. – Counsel for Credit Suisse

12. McCallion & Associates LLP – Counsel for Tim Fuhr

13. McCallion, Kenneth F. – Counsel for Tim Fuhr

14. Meeks, Thomas – Counsel for Credit Suisse

15. The Pearl Law Firm PA – Counsel for Tim Fuhr

16.     Pearl, Robert J. – Counsel for Tim Fuhr

17.     Rivkin, V. David – Counsel for Credit Suisse

18.     Rosenbaum, Robin S. – Judge, United States District Court for the Southern District of Florida (Former)

19.     Torres, Edwin G. – Magistrate Judge, United States District Court for the Southern District of Florida

20.     Zloch, William J. – Judge, United States District Court for the Southern District of Florida

## CORPORATE DISCLOSURE STATEMENT

Credit Suisse AG is a wholly owned subsidiary of Credit Suisse Group AG.

Credit Suisse Group AG (NYSE: CS; SIX: CSGN) is a publicly traded company.

No publicly held corporation owns 10 percent or more of the stock of Credit Suisse

Group AG.

/s/ Bruce J. Berman
BRUCE J. BERMAN
THOMAS J. MEEKS

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Because the primary issue on appeal is one of first impression in this Circuit, *i.e.*, whether 28 U.S.C. § 1728 authorizes foreign tribunals and litigants before them to use a U.S. court to obtain documents located outside of the United States, and because, should other issues be reached, the Court may be assisted in parsing the factual record, Respondent-Appellant Credit Suisse AG believes that oral argument would materially assist the Court in its consideration and determination of this appeal.

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This is an appeal from a November 25, 2015 order by the district court (a) denying a motion by Respondent-Appellant Credit Suisse AG ("Credit Suisse") to quash a subpoena issued in response to an application for judicial assistance under 28 U.S.C. § 1782 and (b) requiring production of Swiss banking records in response thereto. [D.E. 91]. The district court order fully and finally adjudicated Petitioner-Appellee Tim Fuhr's application, which was the sole matter before the court. Credit Suisse timely filed its Notice of Appeal on November 30, 2015. [D.E. 94].

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1782. This Court has appellate jurisdiction under 28 U.S.C. § 1291. *See, e.g.*, *In re Republic of Ecuador*, 735 F.3d 1179, 1182-83 (10th Cir. 2013); *In re Chevron Corp.*, 650 F.3d 276, 286-87 (3d Cir. 2011).

## **INTRODUCTION**

The appeal raises the fundamental question, as a matter of first impression in this Circuit, of whether 28 U.S.C. § 1782 makes U.S. courts available to assist litigants in foreign lawsuits to obtain discovery of documents located outside of the United States.

The applicant, Fuhr, a German national, was sued in a German court by Luis Marimón Garnier ("Marimón"), a Spaniard and former officer of a Deutsche Bank affiliate in Spain.  Marimón sued Fuhr for defamation, relating to statements about Marimón's alleged diversion of funds from a Swiss bank account controlled by Marimón to which Fuhr claims an interest.

To defend himself in the German lawsuit, Fuhr claimed he needed documents from the early 1990s, relating to the transfer of funds from the Marimón account, at a Credit Suisse branch in Geneva, to a Marimón account at a Deutsche Bank (Suisse) branch, also in Geneva – all documents which, if they were still in existence, would be located at the respective bank branches in Switzerland, subject to Swiss privacy laws.  Swiss law provides severe penalties, including prison, for unauthorized disclosure of Swiss banking records.

Fuhr did not seek disclosure from Marimón directly in the German case (where he and Marimón could litigate their adverse positions directly).  Nor did Fuhr ask the German court to request discovery from the Swiss courts (under the

Hague Evidence Convention, to which both countries are signatories). Nor did Fuhr institute any direct civil action against either of the banks in Switzerland, where the respective accounts and documents were located (which would have put Swiss criminal and privacy concerns before a Swiss court). Instead, Fuhr came to the Southern District of Florida and applied for discovery from each of the two banks under § 1782.

The application as to Deutsche Bank was effectively transferred to New York (by jurisdictional dismissal and re-filing). Although Fuhr sought the same document in New York as here, his application was denied. Both the Southern District of New York and the Second Circuit ruled that § 1782 could not be used to obtain documents located outside of the United States.

The district court here came to the opposite conclusion, ordering production of the Swiss documents in Florida. The court's reasoning was set out in a 15-page opinion by the magistrate judge (pre-New York rulings). The district judge adopted it in its entirety, without comment or analysis, in four lines of a two-page order, and with no apparent consideration of the then-issued New York rulings. The adopted rationale of the magistrate judge essentially sidestepped the fundamental legal issues presented by Fuhr's application in two ways:

> first, by holding that Credit Suisse could alter its computer protocols
>
> (designed for compliance with applicable Swiss privacy laws) to make the

Swiss-stored documents accessible electronically from the United States; and

second, by holding that Credit Suisse had no justifiable fear of violation of Swiss privacy laws because Fuhr was actually the bank's account owner, not Marimón, thus deciding a contested issue under Swiss law, and then using this finding (a) to avoid analyzing discretionary factors mandated by the U.S. Supreme Court for deciding § 1782 applications, and (b) to avoid considering principles of international comity.

There has never been a dispute in this case that the documents Fuhr seeks from Credit Suisse, if they exist at all (Swiss privacy law prohibits even this disclosure), would be located on Credit Suisse computer servers in Switzerland and set up in a way – as with all of Credit Suisse's Swiss banking records – to restrict access from the United States and other countries.  Nor has there ever been a dispute that Swiss law prohibits Credit Suisse from disclosures concerning that account to anyone other than its owner, under severe penalties, including criminal sanctions.  As set forth in this brief, there is no evidence in this record establishing Fuhr's claim of interest in these accounts, even if that Swiss-law issue had been properly before the court in Florida.

The federal courts in New York got it right in adjudicating the Deutsche Bank side of Fuhr's application, denying disclosure and rejecting the same

arguments that Fuhr has made here as to the same documents. The court below should have reached the same result; its order to the contrary should now, therefore, be reversed.

## STATEMENT OF THE ISSUES
## PRESENTED FOR REVIEW

I.    Whether the district court erred by ordering Credit Suisse, pursuant to 28 U.S.C. § 1782, to produce to Fuhr, a foreign litigant, for use in a foreign proceeding, documents located outside the United States (in Switzerland), where the statute, as a matter of law and proper statutory interpretation, was never intended to and has been held *not* to permit such discovery.

II.    If 28 U.S.C. § 1782 applies to the Swiss documents Fuhr's petition seeks, whether the district court erred by granting discovery assistance:

(a) by first erroneously determining that Fuhr had an interest in the account from which documents were sought, and therefore ruling that Swiss privacy laws prohibiting disclosure, on pain of civil and criminal sanction, did not apply; and in that way,

(b) abusing its discretion by failing to consider the extent to which Fuhr's request concealed an attempt to circumvent the applicable Swiss law that prohibited disclosure.

III.    If 28 U.S.C. § 1782 applies to the Swiss documents Fuhr's petition seeks, whether the district court, having erred in determining that Fuhr had an

interest in the account and thus finding no conflict with Swiss laws, abused its discretion by failing to undertake an international comity analysis to consider the national interests of Switzerland and other concerns before ordering production.

## STATEMENT OF THE CASE AND FACTS

### A.    THE COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE COURT BELOW

On May 3, 2013, Fuhr filed an *ex parte* application pursuant to 28 U.S.C. § 1782 in the U.S. District Court for the Southern District of Florida to obtain bank account documents from both Credit Suisse and Deutsche Bank AG ("DB").  [D.E. 1].  The basis for the application was that Fuhr needed the documents to defend himself against Marimón's defamation claim in Germany.  *Id.*

On June 14, 2013, DB opposed the § 1782 petition as against DB on the grounds that DB was not "found" in the Southern District of Florida within the meaning of § 1782. [D.E. 9 at 9-11].  On July 25, 2013, Magistrate Judge Torres issued a Report recommending that the § 1782 petition be denied. [D.E. 19].[1]

Fuhr objected to the report [D.E. 21], but *not* as it pertained to DB, informing the court that he would re-file in New York.  He did, however, object to the report to the extent it might have intended to recommend dismissal as to Credit Suisse, which had still not appeared in the matter and was not served with any of

---

[1] Only DB had appeared in the matter as of that time, and the Torres report addressed only the issues raised by DB in its filings.

the papers, including Fuhr's objection.   In particular, Fuhr objected to the magistrate's reference to an article by Professor Hans Smit (preparer of § 1782's present version) relating to the absence of any statutory intent to provide access to *foreign* documents, and Fuhr insisted that this was not his intention, in any event [*id.* at 1-2].   Rather, Fuhr stated: "The evidence that is the subject of this Application is to be found within [Credit Suisse]'s computers that exist in this District …." [*Id.* at 2].   As purported evidence of Credit Suisse's location in the district, Fuhr attached a printout from the Florida Department of State showing Credit Suisse as registered in Florida and having a local registered agent, but with its principal (and only identified) address in Zurich, Switzerland. He also filed copies of annual reports showing both principal and mailing addresses for Credit Suisse, and its officers and directors, at the same location in Zurich.  [*Id.* at 11-18].

On August 29, 2013, then-assigned District Judge Rosenbaum adopted the magistrate's report, dismissing as to DB.  [D.E. 23].  As to Credit Suisse, the court granted Fuhr's application, *ex parte*, "in the absence of any countervailing argument from Credit Suisse AG" (*id.* at 2-3), which had not yet been served with notice.[2]   The court's ruling was based upon Fuhr's objections, and, among other things, his "evidence" that Credit Suisse "has a physical office within this district

---

[2] The first service on Credit Suisse was on September 12, 2013, when it received a copy of the discovery subpoena.  [D.E. 25-1 ¶ 4].  Credit Suisse did not appear until October 3, when it moved  to quash the subpoena issued pursuant to Judge Rosenbaum's order.  [D.E. 24].

. . . and . . . conducts regular banking related and financial business from its Miami office" [D.E. 23 at 3] – neither of which is supported by anything that Fuhr filed at any time in this case.  But the court noted, in addressing the discretionary factors for determining applications under § 1782, that "[t]here is insufficient information on the record to determine whether this specific request circumvents any 'proof gathering restrictions' or policies . . . ." (*id.* at 4), anticipating, however, that Credit Suisse may wish to raise them later.

On September 24, 2013, within 30 days of Judge Rosenbaum's order, Fuhr recommenced his § 1782 application seeking discovery from DB in the district court in the Southern District of New York.

On October 3, 2013, Credit Suisse timely moved to quash the § 1782 subpoena [D.E. 24, 25]; the motion was referred to Magistrate Judge Hunt on October 7, 2013 [D.E. 26].  On February 19, 2014, the magistrate issued a purported "order" denying the motion.  [D.E. 52].  On February 24, 2014, the district court designated that order as a report and recommendation [D.E. 54], and on March 6, 2014, Credit Suisse filed its corrected objection thereto.  [D.E. 58].

While Credit Suisse's objection was pending in the district court in Florida, on August 6, 2014, the Southern District of New York denied Fuhr's § 1782 application to obtain discovery from DB in its entirety.  Credit Suisse filed a copy of that opinion the following day, with a notice of supplemental authority [D.E.

79], noting the "additional reason" of the New York court for denying Fuhr's application that "[t]he documents sought are not located within the United States," and referencing language by the U.S. Court of Appeals for the Second Circuit that "there is reason to think that Congress intended to reach only evidence located within the United States." [*See* D.E. 79-1 at 4].

On September 10, 2015, while Credit Suisse's objection to Magistrate Judge Hunt's order was still pending below, the Second Circuit affirmed. The appellate court's order, filed in this case below by further notice of supplemental authority on October 9, 2015 [D.E. 90], expressly noted: "Entirely absent from the record is any evidence that the information sought is located within the Southern District [of New York]." [D.E. 90-1 at 2].

On November 25, 2015, the district court below, without reference to the New York courts' determination, or, for that matter, to anything other than the magistrate's report to which Credit Suisse objected, adopted that report in its entirety and ordered Credit Suisse to produce the documents to Fuhr. [D.E. 91].

On November 30, 2015, Credit Suisse filed this appeal. [D.E. 94].[3]

---

[3] Credit Suisse moved the lower court for a stay pending appeal [D.E. 95], which the lower court denied on December 14, 2015 [D.E. 103]. Credit Suisse thereafter moved this Court, which granted the stay by order dated January 15, 2016.

**B.    STATEMENT OF THE FACTS**

Fuhr is a German national and a member of a group of individuals who have purchased or otherwise acquired the inheritance interests of a prominent German Jewish family, the Wertheims.  [*See generally* D.E. 1].  Credit Suisse has not challenged Fuhr's claimed status as a Wertheim heir.  [D.E. 56 at 16 n.6].  For more than a decade, Fuhr and his associates have been searching for assets allegedly belonging to the last heir of the Wertheim family dynasty – Dr. Wolfgang Ambrosius Bäuml.  Dr. Bäuml died in 1990.  [D.E. 1 ¶ 15].

In 2006, Fuhr's search for Dr. Bäuml's assets brought Fuhr's associate, Gerda Mangliers, to the offices of Credit Suisse in Zurich.  There, Mangliers met with Credit Suisse employee Renate Sgier [D.E. 42-2].  Mangliers identified herself as a representative of the Bäuml heirs and insisted that Dr. Bäuml was the beneficial owner of a certain Credit Suisse account over which Luis Marimón Garnier, a Spanish lawyer and former Deutsche Bank executive, had power of attorney because the account was opened in the name of his brother, Federico Marimón Garnier [D.E. 42-2 ¶ 5], who has since passed away [D.E. 102-2 ¶ 4(d)].  Mangliers requested that Sgier release Marimón's account information to her for the benefit of her investigation to locate Dr. Bäuml's assets.  [*See id.*; D.E. 43-1 at Exh. 5; D.E. 29 at Exh. 10.  There is no dispute that the Marimón account was opened in 1983 and closed in 1993.  [D.E. 102-2 ¶ 4(a)].

11

Taking Mangliers at her word, and in an effort to assist Mangliers in her investigation, Sgier mistakenly released some of the Marimón account documents to Mangliers, none of which bore any indication that Dr. Bäuml was an actual or beneficial owner of the account.  [D.E. 42-2 ¶ 5].  Sgier disclosed the few account documents to Mangliers with the good intention of helping Mangliers' investigation to locate assets belonging to Dr. Bäuml's estate.  But when it quickly became clear that there was no evidence showing that Dr. Bäuml was the beneficial owner of the Marimón account and, indeed, when Credit Suisse's investigation determined that Dr. Bäuml had no relationship of any kind with Credit Suisse, Credit Suisse refused to provide any further information concerning that account to Mangliers or to any of Dr. Bäuml's heirs or assignees – including Mr. Fuhr – on the grounds that Swiss banking law and privacy law prohibit such disclosure.  [D.E. 42 ¶ 6].[4]  At no time did Credit Suisse make any determination

---

[4] Fuhr cites a letter dated May 11, 2006 from Credit Suisse, which he claims "confirmed beneficial ownership by Dr. Bäuml of the accounts in question" [D.E. 43-1 at Exh. 5; D.E. 29 at Exh. 10], but an actual translation of that correspondence shows that the only thing Credit Suisse confirmed is that it sent Mangliers bank documents concerning Federico Marimón Garnier and Luis Francisco Marimón Garnier in connection with the investigation regarding the whereabouts of Dr. Bäuml's assets.  Credit Suisse was cooperating with Mangliers' investigation, but it certainly did not confirm that Dr. Bäuml was the direct or the beneficial owner of the Marimón account.  [*See id.*].  Fuhr points to no other Credit Suisse writing in which any "confirmation" of Dr. Bäuml's ownership is made.  Logically, if Credit Suisse had made any determination that Dr. Bäuml had an ownership interest in the Marimón account, as Fuhr suggests, Credit Suisse would have turned over the documents that Fuhr sought below.

or representation that Dr. Bäuml had any interest in the Marimón account.  [D.E. 74-1; D.E. 74-2].

Fuhr and his associates approached Credit Suisse again in 2012 to request once more that Credit Suisse turn over the Marimón account documents.  Fuhr once again *claimed* that the Marimón account was held for the benefit of Dr. Bäuml before Bäuml's death and thus further claimed that, as Bäuml's heir, he was entitled to those account documents.

Per Fuhr's request, Credit Suisse again carried out an in-depth review to find out whether any banking relationship ever existed between Credit Suisse and Dr. Bäuml.  [D.E. 74-1 ¶ 6].  After a thorough investigation in 2012, Credit Suisse confirmed to Fuhr in writing that it did not find any evidence of any relationship whatsoever with Dr. Bäuml.  [*Id*.; D.E. 43-1 ¶ 30; D.E. 43-1 at Exh. 4].  Credit Suisse's search in 2012 for records concerning Dr. Bäuml included a full review of the documents and records of the Marimón account.  The result of that investigation was that there is no reference or record in Credit Suisse's documents and records of Dr. Bäuml having any connection to or ownership interest, directly, nominally, or beneficially in the Marimón account.  [D.E. 74-1 ¶¶ 4-7].

On September 5, 2012, after ostensibly receiving an "assignment" of a portion of the Wertheims' alleged "inheritance rights" from Fuhr, Edward D.

13

Fagan[5] filed a lawsuit in the District Court for the Central District of California against several Deutsche Bank entities and Hans Hoffman, the deceased Honorary Consul General of Germany to Spain [*Fagan v. Deutsche Bank AG*, No. CV 12-7582-DSF-MAN (the "California Action")]. In that action, Mr. Fagan alleged that the Deutsche Bank entities helped Mr. Hoffman and Luis Marimón Garnier, a former Deutsche Bank executive, "loot" assets belonging to Dr. Bäuml. The California Action was apparently voluntarily dismissed in January 2013.

On the same date that the California Action was filed, Mr. Fagan filed a lawsuit in the District Court for the District of Columbia against Credit Suisse [*Fagan v. Credit Suisse AG*, No. 12-cv-01468-RBW]. Also on the same day, Thomas Gerdes (Fuhr's attorney in the German defamation action described below) filed a summons with notice in the Supreme Court of the State of New York [*Gerdes v. Deutsche Bank AG*, Index No. 103706/12], on behalf of himself as a representative of the "Interest Association of Wertheim Heirs" against various Deutsche Bank and Credit Suisse entities. Both the *Gerdes* action and *Fagan* action alleged substantially similar claims as those asserted in the California Action. The *Fagan* action was dismissed on November 16, 2012, and no complaint was ever filed in the *Gerdes* case. [D.E. 24 at 2-3].

---

[5] Prominent in Mr. Fuhr's group of alleged Wertheim heirs is Mr. Fagan, a disgraced and disbarred American lawyer, and prodigious serial filer of frivolous lawsuits. [D.E. 24 at 2-3].

Shortly after the filing of the California Action, on September 10, 2012, Luis Marimón Garnier commenced a defamation proceeding in Frankfurt, Germany against Fuhr.  [D.E. 1 at 1-2, 6; D.E. 102-2 ¶ 2].  In that proceeding, Marimón sought, *inter alia*, to enjoin Fuhr from stating that Marimón held the Marimón account beneficially for Dr. Bäuml or that Marimón transferred money from any such account.  [*Id.* ¶ 9].[6]  It was ostensibly to defend himself in that litigation that Fuhr filed the §1782 application from which this appeal arises.[7]

## C.  STATEMENT OF THE STANDARD OF REVIEW FOR EACH CONTENTION

### 1.  *Point I Contention*:

**28 U.S.C. § 1782 cannot be construed and applied, as a matter of law, to require discovery of documents located outside of the United States.**

Because this issue goes to the interpretation of the scope and intent of § 1782, and thus its application to Fuhr's petition for discovery assistance in the

---

[6] On May 7, 2014, the District Court in Frankfurt am Main enjoined Fuhr from stating that Marimón held the bank account at issue beneficially for Dr. Bäuml or that Marimón transferred money from such an account.  The decision was upheld by the German High Court of Appeal on December 10, 2014, and is now on appeal to the German Supreme Court.  D.E. 102-2 ¶¶ 9-11.

[7] If any of the documents collected by Fuhr through his lawsuits and investigations, including those few he obtained from Credit Suisse during his investigation in 2006, had actually established that Marimón held an account at Credit Suisse in which Dr. Bäuml had a beneficial interest, then one would think that this evidence alone would have assisted his defense in the Marimón action in Germany, or at the very least form the basis for the German court to order Marimón to produce the account documents.  However, judgment was entered against Fuhr [D.E. 102-2 ¶ 9], and Fuhr never even applied to the German court to issue an order directing Marimón to produce the account documents.

first instance, the district court's ruling is subject to a *de novo* review by this Court. *See Glock v. Glock, Inc.*, 797 F.3d 1002, 1005-06 (11th Cir. 2015) ("[T]o the extent the district court's decision was based on an interpretation of the § 1782 statute, our review is *de novo*."); *In re Application of Gianoli Aldunate*, 3 F.3d 54, 58 (2d Cir. 1993) (same).

### 2. *Point II Contentions*:

**(a) The district court committed reversible error by finding that Fuhr had an interest in the Swiss Marimón account as to which he sought documents, because there was no evidence in the record to support such findings.**

This issue is subject to review for clear error. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014) (stating that the court of appeals reviews a district court's factual findings for clear error).

**(b) The district court committed reversible error by relying upon the above erroneous finding to ignore conflicting Swiss privacy laws, and thus failing to consider whether Fuhr's request attempted to circumvent Swiss law.**

Whether a § 1782 applicant has attempted, by such application, to circumvent foreign proof-gathering restrictions or other policies of a foreign country is one of the discretionary factors which the court may consider. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 244-45, 124 S. Ct. 2466, 2471 (2004). Accordingly, the standard of review is abuse of discretion, which is generally the case for review of § 1782 determinations. *See Glock*, 797 F.3d at

16

1005 (the Eleventh Circuit "normally reviews the grant or denial of assistance [under § 1782] for an abuse of discretion" (citing *United Kingdom v. United States*, 238 F.3d 1312, 1319 n.8 (11th Cir. 2001))). An abuse of discretion occurs when the district court committed a clear error of judgment in the conclusion it reached. *United Kingdom*, 238 F.3d at 1324.

### 3.   *Point III Contention*:

**The district court failed to undertake the requisite analysis of international comity considerations in making its determination to grant § 1782 discovery assistance.**

These issues are also reviewed by this Court for abuse of discretion. *See Glock*, 797 F.3d at 1005; *see also Perforaciones Exploración y Produccion v. Maritimas Mexicanas, S.A. de C.V.*, 356 F. App'x 675, 680 (5th Cir. 2009) (stating that a district court's decision to exercise or decline jurisdiction in the face of international comity concerns is reviewed for abuse of discretion); *United Kingdom*, 238 F.3d at 1324.

## SUMMARY OF THE ARGUMENT

I.    The district court erred, as a matter of law, in ordering Credit Suisse to produce documents located outside of the United States in response to Fuhr's § 1782 subpoena. Whether § 1782 authorizes such extraterritorial production is an issue of first impression in this Circuit. Longstanding policy considerations, the history and intent of the statute, and the decisions of a number of courts in other

17

circuits, including the New York district court that denied Fuhr's related application (originally part of the proceeding below) and the Second Circuit that affirmed that denial, together compel the conclusion that extraterritorial production is outside the scope of the statute and that the statute should not be construed to permit it.

In granting Fuhr's application in this case, the lower court avoided the issue of whether the statute should have extraterritorial application by accepting Fuhr's argument that documents located in another country can be made accessible by computer here and, thus, deeming the documents sought by Fuhr to be effectively located in the United States.  That does not, however, change the analysis or support a contrary conclusion (and was properly rejected by the New York courts which considered Fuhr's related application).  It also fails to consider that there is no local accessibility in fact, because Swiss account information stored on servers in Switzerland are *not* in fact accessible to Credit Suisse in the United States.

II.    In granting Fuhr's application, the lower court also avoided considering the severe criminal and civil consequences, upon both Swiss banks and their employees, for violation of Swiss privacy laws.  It did not disagree with the statements of Swiss attorneys concerning such laws, but simply averted the issue by deciding that there could be no violation of such laws, based upon its ruling, as a matter of fact (and in Marimón's absence) that Fuhr succeeded to Dr. Bäuml's

purported beneficial ownership of the Marimón account, and was therefore Credit Suisse's customer.  But there is no evidence in the record to support that finding. Fuhr's prolix briefing and declarations only show that he had an interest in assets belonging to Dr. Bäuml, and *not* that Dr. Bäuml, in turn, had any interest in the Marimón account or any relationship with Credit Suisse.  Credit Suisse did not contest Fuhr's status as an heir, but did offer competent evidence that Dr. Bäuml had no relationship with Credit Suisse.

By erroneously ruling that Fuhr had an interest in the Marimón account, the lower court thus avoided consideration of a discretionary *Intel* factor for evaluating § 1782 applications – whether the application conceals an attempt to circumvent foreign laws.  Yet, that is exactly the case here.

Accordingly, even if § 1782 could properly be used in this case to enable Fuhr to prevail upon a court in Florida to obtain the Swiss-located documents, the lower court committed clear error in its erroneous finding of Fuhr's interest in the account, and thereby abused its discretion by failing to account for Fuhr's attempts to avoid the prohibitions of Swiss law.

III.    Based upon the same erroneous finding that Dr. Bäuml had an interest in the Marimón account, the lower court neglected to consider fundamental principles of international comity.  Thus, even if § 1782 could properly be used to seek the Swiss-located documents here, the lower court committed plain error in its

erroneous finding of Fuhr's interest in the account, and abused its discretion by failing to consider the important national interests of Switzerland in the enforcement of its privacy and banking secrecy laws.

## ARGUMENT

I.   **THE DISTRICT COURT ERRED IN ORDERING DISCOVERY OUTSIDE THE TERRITORIAL SCOPE OF SECTION 1782**

A.   **Section 1782 Was Never Intended To Provide For The Discovery Of Documents Located Outside Of The United States.**

Fuhr's § 1782 petition sought a subpoena to compel the production of documents located in Switzerland, relating to the transfer of funds from a bank account at a Credit Suisse branch in Geneva, to a Deutsche Bank (Suisse) branch, also in Geneva, purportedly for use by Fuhr, a German citizen defending a defamation action in Germany, filed by a Spanish plaintiff.  [D.E. 1 ¶¶ 3, 35-36.] It was not disputed that the documents were located, if anywhere, in Switzerland, and not in the United States.  [D.E. 25-2 ¶ 10; D.E. 25-4 ¶ 6; D.E. 58-1 ¶ 5; D.E. 58-2 ¶ 4.]

The bulk of reasoned federal court decisions and the statute's legislative history support the conclusion that § 1782 was never intended to make U.S. federal courts a forum for obtaining evidence located outside the United States, even where the statute's other prerequisites may be satisfied.

The purpose of § 1782 is to assist foreign litigants in obtaining evidence located here in the United States for use in their cases abroad.  According to

Professor Hans Smit, the reporter for the U.S. Commission on International Rules of Judicial Procedure and the preparer of the present version of the statute, "[t]he drafters of Section 1782 did not anticipate recourse to Section 1782 for" the purpose of obtaining documents located in foreign countries.  Hans Smit, *American Assistance to Litigation in Foreign & International Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1, 11 (1998).  As Professor Smit explained:

> [T]he evident purpose of Section 1782 is to make available to foreign and international tribunals and litigants evidence to be obtained in the United States.  Thus, a harmonious scheme is established:  Evidence in Spain is obtained through proceedings in Spain, evidence in Great Britain is obtained through proceedings in Great Britain, and evidence in the United States is obtained through proceedings in the United States.

*Id.*  Numerous courts have relied on Smit's commentary in interpreting the intent of § 1782.  *See, e.g.*, *In re Godfrey*, 526 F. Supp. 2d 417, 423 (S.D.N.Y. 2007).

In *In re Application of Sarrio S.A.*, for example, the court found that "despite its unrestrictive language, Section 1782 was not intended to provide discovery of evidence maintained within a foreign jurisdiction."  1995 WL 598988, at *1, 2 (S.D.N.Y. Oct. 11, 1995).  In addition to Smit's commentary, the court relied on the legislative history of the statute, which "reflects that the primary intent of the 1964 amendments to Section 1782 was 'to clarify and liberalize existing U.S. procedures for assisting foreign and international tribunals and litigants in

21

obtaining oral and documentary *evidence in the United States*.'" *Id.* at \*2 (citing S. Rep. No. 1580, 88th Cong., 2nd Sess. (1964)). The *Sarrio* court, accordingly, was "unwilling to hold that Section 1782 requires production of evidence located in Spain," noting that the petitioner was "free to obtain production of documents located in Spain by court procedures in Spain." *Id.* at \*3.[8]

*Norex Petroleum Ltd. v. Chubb Insurance Co. of Canada* interpreted the statute in the same way, pointing to the "body of caselaw [which] suggests that § 1782 is not properly used to seek documents held outside the United States as a general matter," and holding that "extraterritorial application of § 1782 would not be in keeping with the aims of the statute." 384 F. Supp. 2d 45, 52, 55 (D.D.C. 2005); *see also In re Grupo Unidos Por El Canal, S.A.*, 2015 WL 1810135, at \*10 (D. Colo. Apr. 17, 2015) ("[I]t would be outside the jurisdictional reach of the statute to compel [production of] documents that are physically in Panama, regarding conduct in Panama . . . ."); *In re Kreke Immobilien KG*, 2013 WL 5966916, at \*4 (S.D.N.Y. Nov. 8, 2013) ("[A] § 1782 respondent cannot be compelled to produce documents located abroad."); *In re Microsoft Corp.*, 428 F.

---

[8] Although *Sarrio* was remanded (on a waiver issue), the Second Circuit otherwise "found no fault with [the district court's] order quashing the subpoena directed against" the bank, including the court's interpretation of § 1782 and determination that "Congress intended to reach only evidence located within the United States." *In re Application of Sarrio, S.A.*, 119 F.3d 143, 147, 148 (2d Cir. 1997).

Supp. 2d 188, 194 n.5 (S.D.N.Y. 2006) ("§ 1782 does not authorize discovery of documents held abroad.") (citing *Norex*).

**B.    Section 1782's Lack Of Extraterritorial Application Is Supported By Sound Policy Considerations.**

Sound policy considerations further weigh against the extraterritorial application of § 1782.   The rationale underlying the canon of statutory interpretation that provides a presumption against extraterritorial application of federal statutes is instructive.   As the U.S. Supreme Court has explained, "[t]hat canon provides that '[w]hen a statute gives no clear indication of an extraterritorial application, it has none,' and reflects the 'presumption that United States law governs domestically but does not rule the world.'"   *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (citations omitted).   "This presumption 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'"   *Id.* (citation omitted).

Nothing in the text of the statute here evinces any intent by Congress to give § 1782 extraterritorial effect.   Yet that is exactly the effect of the district court's order, forcing the production of Swiss documents in the Southern District of Florida – a forum with no connection whatsoever to the bank accounts at issue in the German proceeding (or any other connection to the parties or controversy in Germany).   As a general matter, giving the statute extraterritorial effect risks

23

clashes with the laws of other nations – the very risk acknowledged by the Supreme Court in *Kiobel* and sought to be averted by the canon of statutory construction set forth by the Court.  And it is exactly this risk which materialized here, creating a direct conflict where, as set out below, compliance by Credit Suisse with the order appealed from would violate Swiss criminal and civil laws.

As Smit explained, there were "potent reasons for not giving" the statute extraterritorial effect.  Smit, *supra*, 11-12.  In an affirmation filed in the *Sarrio* case, Smit wrote that if § 1782 could be used to obtain discovery located in a foreign country, "it would become an instrument for interfering with the regular court procedures of the foreign country," and "there would be a heavy influx of discovery applications under § 1782 into the United States, especially in jurisdictions where many financial and multi-national institutions are centered." 1995 WL 598988, at *2.  Smit further explained:

> [I]f Section 1782 could be used for this purpose, American courts would become clearing houses for requests for information from courts and litigants all over the world in search of evidence to be obtained all over the world.  And the burden to produce that information would be imposed on persons in the United States who have operations abroad.  With American banks and financial institutions doing business all over the world, finding such a person would be relatively simple.  It is no coincidence that most of the cases concerning the production of evidence to be produced or to be obtained abroad have involved banks doing business in the United States and abroad.  Federal courts and American business should not be saddled with such significant burdens in the absence of a legislative intent clearly expressed.

[I]f American courts were to assume the role of clearing houses for world-wide information gathering, conflicts with foreign countries would inevitably arise.

Smit, *supra*, 12-13.

A central purpose of § 1782 is to encourage international reciprocity, so that just as U.S. courts would assist foreign tribunals by providing access to discovery here, so too would foreign courts provide U.S. courts with access to discovery in their jurisdictions to aid in resolving disputes here. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252, 124 S. Ct. 2466, 2476 (2004) (to "encourag[e] foreign countries by example to provide similar assistance to our courts"). For such intent to encompass the reverse, *i.e.*, U.S. courts reaching into *other* countries to compel discovery to assist in foreign proceedings is illogical, if not ludicrous.

In the context of such policy considerations, the significance of what the lower court did here, and its importance to § 1782 jurisprudence if left undisturbed, cannot be overstated. This entirely unwarranted and intrusive foray into foreign countries, by extending this statute's coverage to encompass documents located in other countries, stands so starkly against its underlying policies and the reasoned opinions of other courts, including the Second Circuit, that Fuhr's own counsel, Kenneth McCallion, could not resist publically pronouncing this decision as "historic" in securing the holding "that multinationals operating on U.S. soil may

have to produce documents to foreigners, in cases of legal assistance requests, ***even if these documents are not physically on American soil***." [D.E. 102-1].[9]

This unwarranted and erroneous interpretation of § 1782, which can only turn the Southern District of Florida into the unlimited clearinghouse for global discovery that Professor Smit warned against, should be reversed.

### C.    Potential Electronic Access to Documents Located Outside the United States Cannot Alter The Proper Interpretation Of § 1782.

The district court's focus on technologically possible remote access to electronically stored documents on foreign servers as the basis for disregarding the location of the documents in Switzerland (and thus also as the basis for disregarding the case law holding § 1782 inapplicable to discovery of documents located offshore) is a distinction without a difference.  It is undisputed that the bank documents sought from Credit Suisse, to the extent that they exist, would be physically located in Switzerland, stored electronically on its servers in Switzerland, and would ***not*** in fact be accessible from the United States.  Credit Suisse raised this point repeatedly below.  [D.E. 58-1 ¶ 5; D.E. 58-2 ¶ 4; D.E. 25-4 ¶ 6; D.E. 25-2 ¶ 10].

This restricted access to the records, from the United States and anywhere else outside of Switzerland, is neither arbitrary nor unreasonable.  Indeed, Credit Suisse's computer systems are set up deliberately to preserve the privacy of Swiss

---

[9] Emphasis is supplied to quotations herein, unless otherwise specified.

banking files, in compliance with and to avert violations of Swiss banking laws, by making them inaccessible to Credit Suisse personnel elsewhere, including in the United States.  [D.E. 95-1 ¶¶ 3-6; D.E. 95 at 6].  Inaccessibility in the United States was confirmed by a search in Credit Suisse's systems in the United States, which located no records responsive to the items sought in the subpoena here.  [D.E. 95-1 ¶ 7; D.E. 25-4 ¶ 5; D.E. 25-2 ¶ 10].

The magistrate judge tried to sidestep the location issue, stating:  "Applicant does not seek physical documents from Switzerland.  Rather, Applicant seeks access in this District to the electronically stored information . . . ." [D.E. 52 at 13].  But this was a fiction.  Although Credit Suisse was registered to do business in Florida and had appointed an agent for service in this district, its former offices had previously been closed, it had no offices or employees in the district, and, thus, it had no facilities from which to access anything.  [D.E. 25-2 ¶¶ 5-8].  Ignoring these undisputed facts, and acknowledging that the documents sought reside on servers in Switzerland, the lower court effectively required Credit Suisse to make those Swiss-stored documents accessible "in this District through electronic retrieval." [D.E. 52 at 13].[10]

---

[10] The court's fiction aside, it makes no sense whatsoever that a court could avoid the limitations on the scope of § 1782 by ordering Credit Suisse to take action in Switzerland to make its servers accessible from this District, even if there were computers here.  Such an order would be no different than an order

27

This artifice would transform foreign-located and foreign-stored documents into domestic ones (potentially accessible here, or anywhere else around the globe), and does nothing to avert the feared clash of laws anticipated in the Smit analysis.  Nor does this alchemy work here, where the Swiss law prohibition against disclosure remains.  Forcing Credit Suisse, even if technically possible, to make its Swiss server data accessible out of country would present significant compliance risks and potential criminal liability for Credit Suisse.  [D.E. 95-1 ¶ 7].

Fuhr tried to make this same "ESI" argument in the related New York proceeding – and failed.  There, as here, Fuhr posited that Deutsche Bank and its U.S. personnel have custody and control over documents "since, if and to the extent that any documents are located abroad, they are electronically stored and accessible from New York by Deutsche Bank AG's Legal and Legal & Compliance Department in New York."  Pet. Fuhr's Mot. for Reconsideration, *In re Application of Fuhr*, No. 1:13-cv-06753, D.E. 34 at 11 (S.D.N.Y. Aug. 22, 2014).  The argument was rejected by the New York court for the same reasons that Credit Suisse asserted in opposition to discovery here, including the documents' electronic *in*-accessibility:

> In opposing Fuhr's petition, Deutsche Bank AG makes clear that the ***documents sought are located in Switzerland and cannot be accessed electronically from the United States***.  Fuhr also concedes

---

commanding a Credit Suisse employee in Switzerland to simply mail to this District copies of items reposed there.  There is plain extraterritorial effect.

that the documents are not located in New York, but rather in Germany, Spain, or Switzerland.  Given that the defamation action arose out of conduct that took place in Germany, that the parties are all located in Germany, and that all physical documents are located abroad, "the connection to the United States is slight at best and the likelihood of interfering with [foreign] discovery policy is substantial." *Godfrey*, 526 F. Supp. 2d at 423.  Even Fuhr admits that under German discovery rules, he might not be able to obtain the documents from Deutsche Bank in the German court.  Moreover, Deutsche Bank contends that Fuhr's request for Swiss bank records violates Swiss law.  Thus, the court finds that it would be ***inappropriate to compel Deutsche Bank AG to produce the documents sought by Fuhr***.

*In re Application of Fuhr*, No. 1:13-cv-06753, D.E. 33, at 4-5 (S.D.N.Y. Aug. 6, 2014).  [D.E. 79-1].  The Second Circuit *affirmed* the dismissal, holding:

> Even assuming arguendo that Deutsche Bank AG is "found in" the Southern District as required by the statute, the district court did not abuse its discretion in denying the petition.  ***Entirely absent from the record is any evidence that the information sought is located within the Southern District***.

*Fuhr v. Deutsche Bank, AG*, 615 F. App'x 699, 700 (2d Cir. 2015).  [D.E. 90-1].

Multiple other courts have reached the same conclusion.  In considering whether the petitioners application met the statutory requirements for invoking § 1782, the court in *In re Grupo Unidos Por El Canal, S.A.* considered the "cyber-location" of the documents sought pursuant to the application – and rejected the invitation to ignore their actual foreign location.  2015 WL 1810135, at *9-10 (D. Colo. Apr. 17, 2015).  There, the "physical documents" sought were "located out of the United States," but, unlike here, it was conceded that the respondent "ha[d]

the ability to electronically retrieve documents which might technically be in the possession of its foreign subsidiary." *Id.* at *9.  Nonetheless, recognizing that "there is reason to think that Congress intended to reach only evidence located within the United States," the court held that "it would be outside the jurisdictional reach of the statute to compel [production of] documents that are physically in Panama, regarding conduct in Panama . . . , and where electronic documents are accessible just as easily in Panama as from the parent company in the United States." *Id.* at *9, 10.

Similarly, *In re Kreke Immobilien KG* rejected the argument "that, given the electronic data storage practices of modern businesses, there is reason to believe that the 'great bulk' of the documents requested could be accessed just as easily from New York as from anywhere else in the world."  2013 WL 5966916, at *3 (S.D.N.Y. Nov. 8, 2013).  The court denied the § 1782 application and explained:

> Given that this case arose out of conduct that took place in Germany, that the parties are all located in Germany, that all physical documents are in Germany, and that all electronic documents are accessible just as easily from Germany as from Deutsche Bank's offices in New York, the connection to the United States is slight at best and the likelihood of interfering with foreign discovery policy is substantial. Thus, this Court finds that it would be inappropriate to compel Deutsche Bank, pursuant to § 1782, to produce the documents sought by Kreke . . . ."

*Id.* at *4 (internal citations and quotation marks omitted). Just as in *Grupo Unidos* and *Kreke*, the documents the district court ordered Credit Suisse to produce below are outside the jurisdictional reach of § 1782.

Fuhr's cyber argument, adopted by the court below, that modern day electronic advances transform the "location" of documents to any and every place where they can *potentially* be electronically accessed, makes no practical sense. D.E. 52 at 12-13. While it is certainly true that technological advances enhance the *ease* of accessibility, by remote access, to documents stored on servers around the globe, such access has always existed by alternative means, as by mail, facsimile transmission, or by sailing ship. Technological improvements in already existing means of *access* to a document do not change the document's *location*, and provide no rational basis for any change of the majority view – including that of the Second Circuit in Fuhr's own case – that § 1782 was not intended for use in obtaining documents *located* outside the United States. *See Kestrel Coal Pty. Ltd. v. Joy Global, Inc.*, 362 F.3d 401, 406 (7th Cir. 2004) ("Although air transportation, the Internet, and even fax machines have shrunk the globe, it remains best to conduct an Australian suit in Brisbane rather than in Milwaukee, which is 8,915 miles away."). It is the location of the documents that is the issue under § 1782, not the places around the globe from which they could be potentially

accessed.  To hold otherwise is to misuse § 1782 for a purpose for which it was not intended.

In short, nothing in § 1782 itself supports the extraordinary proposition that it was intended to apply in circumstances like those presented here.  The statute does not authorize discovery to a German litigant, through U.S. courts, of documents located in Switzerland, relating to the purported transfer of funds between two banks in Switzerland, for the German litigant's use against a citizen of Spain prosecuting a defamation proceeding in a German court.  No link in this chain has any connection whatsoever to the Southern District of Florida, the Eleventh Circuit, or anywhere else in the United States.

Such an interpretation of § 1782 certainly gains no support, as the district court suggested [D.E. 52 at 14], from the statute's "twin aims" of "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts."  *Intel*, 542 U.S. at 252, 124 S. Ct. at 2476 (internal quotation marks and citation omitted). The district court's order requires Credit Suisse to produce, in the Southern District of Florida, documents located in Switzerland, which the record demonstrates would require Credit Suisse to take action in Switzerland, to change system restrictions imposed by Swiss law to allow for extraordinary electronic access outside of Switzerland.  This is the antithesis of "efficient assistance" and does

nothing to foster the reciprocity intended to be advanced by the statute given its clear conflict with Swiss banking laws.[11]

Because the district court erred as a matter of law in ordering Credit Suisse to produce discovery pursuant to Fuhr's subpoena that exceeded the territorial reach and scope of § 1782, the district court's order declining to quash Fuhr's § 1782 subpoena should be reversed.

## II. EVEN IF § 1782 APPLIED, THE DISTRICT COURT ABUSED ITS DISCRETION BY GRANTING ASSISTANCE WHERE THE RECORD SO CLEARLY DEMONSTRATED A CONCEALED ATTEMPT TO CIRCUMVENT FOREIGN PROOF-GATHERING REQUIREMENTS

The Supreme Court held, in *Intel*, that § 1782(a) authorizes, *but does not require*, a federal court to provide judicial assistance to interested persons in proceedings abroad.  542 U.S. at 247, 264, 266, 124 S. Ct. 2473, 2483, 2484.  In addressing the legislative history, the court noted the observation in the Senate Report that the statute "'leaves the issuance of an appropriate order to the discretion of the court which, in proper cases, may refuse to issue an order . . . .'" *Id.* at 260-61, 2481 (internal citation omitted).  Significant among the court's

---

[11] As discussed in Parts II and III below, the magistrate judge's avoidance of the otherwise insurmountable problem created by the conflict with Swiss banking laws was achieved by his ruling that those laws did not apply.  This adjudication was clearly erroneous.  It was unsupported by the record, inconsistent with opinions of Swiss counsel to the contrary, and an incursion, in violation of fundamental principles of comity, into issues of Swiss law that can only properly be determined by a Swiss court.  This error further warrants reversal of the district court's denial of Credit Suisse's motion to quash the subpoena.

recitation of "factors that bear consideration in ruling on a § 1782 request" is the following:

> Specifically, a district court could consider whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.

*Id.* at 264, 2483.  This is precisely the situation here, where Fuhr seeks documents from Switzerland which cannot be disclosed without violating Swiss law.

These documents, to the extent they exist, would be private banking records located at a Credit Suisse branch in Geneva, Switzerland.  It is well-established that account information, transfer information, account opening and closing documents, fiduciary and beneficiary information, transfer instructions, and correspondence between a bank and another bank or a third party concerning specific accounts are ***unambiguously*** protected from disclosure to third-parties pursuant to the legal and contractual duty of confidentiality statutorily imposed on Swiss banks.  [D.E. 25-3 ¶¶ 4-45]; *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 404 (S.D.N.Y. 2014); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 524 (S.D.N.Y. 1987) ("*Minpeco I*").  Further, a violation of Swiss bank secrecy laws constitutes a criminal offense punishable by up to three years in prison or by a fine of over $1 million USD.  [D.E. 25-3 ¶¶ 11-45]; *Motorola*, 73 F. Supp. 3d at 404; *Minpeco I*, 116 F.R.D. at 524.  There is, thus, a presumptive barrier to Credit Suisse's production of the requested documents.

Although § 1782 does not impose a foreign-discoverability or exhaustion requirement, a petitioner's conduct prior to seeking § 1782 discovery is informative as to whether the petitioner is seeking to use the U.S. court system to evade foreign laws and/or an unfavorable decision from a foreign tribunal with clear jurisdictional authority. *In re IPC Do Nordeste, LTDA*, 2012 WL 4448886, at *8-9 (E.D. Mich. Sept. 25, 2012); *In re Kreke*, 2013 WL 5966916, at *6-7; *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 195-96 (S.D.N.Y. 2006).

There is no question that, in all the years that he claims to have sought the requested information, Fuhr has never taken any *legal* steps in Switzerland to secure the information and/or establish that he is, as he claims, the "client" or the beneficial owner of the Credit Suisse account in question under Swiss law. [D.E. 37-5 ¶ 6]. Fuhr's excuses, tendered as explanation, instead evidence his intent to use U.S. courts (in Florida as to Credit Suisse, and ultimately New York as to Deutsche Bank) in an attempt to circumvent foreign law. According to one affirmation of Swiss counsel submitted by Fuhr, ". . . the strong banking and privacy laws of Switzerland effectively prohibit [Fuhr and others] from getting . . . documents related to the accounts of Dr. Bäuml or where he was beneficial owner" [D.E. 3-1 ¶ 5]; and according to another of Fuhr's Swiss lawyer, "I can confirm the difficulties, if not factual impossibility for Mr. Tim Fuhr, to use Swiss courts . . . to get, e.g. from Credit Suisse and/or Deutsche Bank, documents related to the

accounts of Dr. Bäuml or where Dr. Bäuml was the beneficial owner." [D.E. 37-2 ¶ 4].

In addition, Fuhr has never attempted to obtain the requested information directly from Marimón, who sued him, or through the German court via the Hague Convention or even by requesting that the German court order Marimón, as plaintiff in that proceeding, to produce these documents.

Given Fuhr's position that Swiss law and/or German rules would likely limit his ability to obtain, if not prevent him from obtaining the Credit Suisse account records, the reasonable assumption must be that Fuhr primarily sought the bank records here in an attempt to circumvent applicable Swiss laws and an unfavorable decision from the German court. *See Kreke*, 2013 WL 5966916, at *6 ("It would create a perverse system of incentives – one counter to the efficiency and comity goals of § 1782 – to encourage foreign litigants to scurry to U.S. courts to preempt discovery decisions from tribunals with clear jurisdictional authority. . . . Exhaustion is one thing, but evasion is quite another.").

The district court avoided the circumvention factor, however, by adopting the magistrate judge's erroneous determination that the Swiss bank secrecy laws did not apply because Fuhr was effectively Credit Suisse's customer.  [D.E. 52].[12]

---

[12]  The district court's conclusion that Credit Suisse previously acknowledged the rights of Fuhr to the subject Swiss bank account based on its prior production of a few documents in 2006 to a representative of the purported

The magistrate judge, however, did not have a sufficient basis to adjudicate the rights or ownership interest in the subject Swiss bank account, even if it were appropriate for a U.S. court to do so.

To reach its conclusion that Fuhr was Credit Suisse's customer, the magistrate judge made two successive findings, one express and one implied: first, that Fuhr succeeded to the rights of Dr. Bäuml, as his heir; and then, second, implicitly and necessarily, that Dr. Bäuml was the owner of the subject Credit Suisse account. While Credit Suisse never challenged the first assertion (the Fuhr/Bäuml connection), it did indeed reject the second – which is why it refused to continue to cooperate in the 2006 investigation (*see supra* n.12).

The magistrate's adjudication of Fuhr's ownership of the account was an unjustified leap, and thus clearly erroneous, in the absence of any evidence of a banking relationship between Dr. Bäuml and Credit Suisse or any relationship between Dr. Bäuml and the subject Marimón account. [D.E. 74 at 4; D.E. 74-1 ¶¶ 6-7; D.E. 74-2 ¶ 6].[13]

---

Bäuml heirs is clearly erroneous. The record evidence demonstrated that none of those documents bore any indication that Dr. Bäuml was an actual or beneficial owner of **the Marimón account**. [D.E. 42-2 ¶ 5]. Although it initially cooperated in their investigation, Credit Suisse immediately ceased sharing any account information with the purported Bäuml heirs after its own investigation revealed that Dr. Bäuml had no connection to the subject account. [*Id.* ¶¶ 5-6].

[13] That factual error was likely the result of Fuhr's incessant repetition of his claim as Bäuml's heir – the  claim which Credit Suisse never challenged. [D.E. 55

The magistrate's ruling (as to an issue governed by Swiss law and with no connection to the United States) was not only unsupported by evidence, it was made without all interested (and necessary) parties present, specifically Marimón, who was not party to the § 1782 proceeding but whose rights vis-à-vis Fuhr were implicitly adjudicated. *See Singleton v. Wulff*, 428 U.S. 106, 113, 96 S. Ct. 2868, 2894 (1976) (stating that federal courts should not resolve a controversy based on the rights of third persons not parties to the proceedings).

In sum, the magistrate's ruling, adopted in whole by the district judge, relied upon an erroneous finding of fact, Fuhr's claimed account ownership, in order to disregard a key discretionary factor – Fuhr's circumvention of foreign law. Consideration of that factor was critical to determining whether § 1782, even if applicable, should permit the discovery sought here. The court's erroneous finding of fact is reviewable for clear error; its failure to consider the circumvention factor was an abuse of discretion. *See Gianoli Aldunate*, 3 F.3d at 61 (indicating that it would be an abuse of discretion if the court failed to consider the *Intel* factors); *Glock*, 797 F.3d at 1006 (noting that a district court abuses its discretion by following improper procedures in making a determination, making findings of fact

---

at 4, subsection (g); D.E. 64-1 ¶¶ 36-38]. What *was* challenged is whether *Dr. Bäuml* had any interest in the Marimón account from which the records were sought. Credit Suisse's search of its records, conducted in Switzerland long before this case, revealed no evidence of any such interest. [D.E. 74-1].

that are clearly erroneous, misconstruing its role, or basing its decision upon considerations having little factual support); *see also Highmark*, 134 S. Ct. at 1748 (stating that a court of appeals reviews a district court's factual findings for clear error).

## III.    EVEN IF § 1782 APPLIED, THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO CONDUCT AN INTERNATIONAL COMITY ANALYSIS

The Supreme Court, in *Société Nationale Industrielle Aérospatiale v. U.S. District Court*, 482 U.S. 522, 107 S. Ct. 2542 (1987), held that courts *must* engage in a "particularized analysis" of the respective interests of a foreign nation and the United States before ordering discovery that may cause the responding party to violate the foreign sovereign's laws.  *Id.* at 544 & n.28, 546, 107 S. Ct. 2555-57; *see also Linde v. Arab Bank, PLC*, 706 F.3d 92, 111 (2d Cir. 2013) (noting that courts must weigh "*all* of the relevant interests of *all* of the nations affected by the court's decision").[14]

Notwithstanding Credit Suisse's assertion, in seeking to quash the subpoena, that the principles of international comity must be considered and mitigate issuance of the § 1782 subpoena [D.E. 24 at 13, *et seq.*], the magistrate judge eschewed the

---

[14]  Federal courts have long recognized that the potential for criminal sanctions and likely exposure to civil liability present significant hardship weighing heavily in a comity analysis. *See Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211, 78 S. Ct. 1087, 1095 (1958); *Minpeco I*, 116 F.R.D. at 525-26.

comity analysis altogether based on the same clearly erroneous finding of fact that he used to summarily dispose of the key *Intel* factor (circumvention of foreign law). Thus, having first decided, without supporting evidence, the Fuhr was the owner of the Credit Suisse account, the magistrate concluded that there is no comity concern because Credit Suisse's production of the bank records would not violate Swiss laws. [D.E. 52 at 10-11.] This finding was not only clearly erroneous in light of the record evidence, but also overstepped the lower court's authority by refusing to defer to the Swiss courts on a disputed issue bearing on and governed exclusively under Swiss law.[15]

The district court thus abused its discretion when it granted Fuhr discovery assistance without any consideration of the interests of Switzerland, much less respect for these interests, and with no apparent consideration of the limited, if any, interest of the United States, particularly given the extraterritorial location of the documents sought and the wholly foreign nature of the predicating litigation in German. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 139 (2d Cir. 2014); *Chevron Corp. v. Doziger*, 296 F.R.D. 168, 198, 204 (S.D.N.Y. 2013); *see also*

---

[15] At least one court has denied discovery of Swiss bank records on international comity grounds even after finding, as the district court did here, that the requesting party was the bank's customer. *S.E.C. v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 339 (N.D. Tex. 2011) (finding applicant "was a bank customer demanding that a bank produce his own records" but holding that "because [the Swiss Bank] shows that unilateral compliance runs the risk of prosecution, the Court finds that comity counsels deference to [the Swiss Bank's] potentially well-founded fear").

*Motorola*, 73 F. Supp. 3d at 404 ("Switzerland's bank secrecy regime constitutes, not just a seriously enforced national interest, but almost an element of the national identity."); *Minpeco I*, 116 F.R.D. at 524 (stating that the Swiss interest in bank secrecy was substantial); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 118 F.R.D. 331, 333 (S.D.N.Y. 1988) ("*Minpeco II*") (same).

## CONCLUSION

The order below should be reversed and the subpoena vacated, as a matter of law, because § 1782 does not apply to Fuhr's application for judicial assistance for the production of documents located in Switzerland.

Alternatively, in the event the Court should determine that § 1782 applies, the order below should be reversed and the subpoena vacated because of the erroneous finding of Fuhr's ownership interest in the Marimón account and the lower court's abuse of discretion both in failing to apply (a) the discretionary factors under the statute and (b) applicable principles of international comity; and the matter should thereupon be remanded to the district court to apply both of the above.

Dated:  January 22, 2016        Respectfully submitted:

/s/ Bruce J. Berman
Bruce J. Berman (Fla. Bar No. 159280)
bberman@cfjblaw.com
Thomas J. Meeks (Fla. Bar No. 314323)
tmeeks@cfjblaw.com
CARLTON FIELDS JORDEN BURT, P.A.
100 Southeast Second Street, Ste. 4200
Miami, Florida  33131
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

*Counsel for Respondent-Appellant*
*Credit Suisse AG*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, <u>AND TYPE STYLE REQUIREMENTS</u>**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    x       this brief contains 11,064 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    □       this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    x       this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 Point type, or

    □       this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

    /s/ Bruce J. Berman

    *Attorney for Appellant Credit Suisse AG*
    Dated:  January 22, 2016

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 22, 2016, I e-filed the foregoing brief

with the Court using CM/ECF, which will electronically serve a true and correct

copy on all counsel of record.  I further certify that a copy of this brief was served

via First-Class U.S. Mail on this same date upon:


Robert J. Pearl, Esq.  
robert@investorattorney.com  
The Pearl Law Firm PA  
7400 Tamiami Trail N., Ste. 101  
Naples, FL 34108  
Tel: (239) 653-9330  
Fax: (239) 653-9377  
*Attorney for Appellee Tim Fuhr*

Kenneth F. McCallion, Esq.  
kfm@mccallionlaw.com  
McCallion & Associates LLP  
100 Park Avenue – 16th Floor  
New York, NY 10017  
Tel: 646-366-0880  
*Attorney for Appellee Tim Fuhr*


*/s/* Bruce J. Berman  
BRUCE J. BERMAN

# <u>ADDENDUM</u>

<u>*Page*</u>

28 U.S.C. § 1782 ............................................................................. ADD-1

Hans Smit, *American Assistance to Litigation in Foreign & International*

    *Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited,*

    25 Syracuse J. Int'l L. & Com. 1, 11 (1998) ........................................... ADD-2

> United States Code Annotated
>     Title 28. Judiciary and Judicial Procedure (Refs & Annos)
>         Part V. Procedure
>             Chapter 117. Evidence; Depositions (Refs & Annos)

28 U.S.C.A. § 1782

§ 1782. Assistance to foreign and international tribunals and to litigants before such tribunals

Effective: February 10, 1996
<span style="color:blue">Currentness</span>

**(a)** The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

**(b)** This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

**CREDIT(S)**

   (June 25, 1948, c. 646, 62 Stat. 949; May 24, 1949, c. 139, § 93, 63 Stat. 103; Oct. 3, 1964, Pub.L. 88-619, § 9(a), 78 Stat. 997; Feb. 10, 1996, Pub.L. 104-106, Div. A, Title XIII, § 1342(b), 110 Stat. 486.)

Notes of Decisions (300)

28 U.S.C.A. § 1782, 28 USCA § 1782
Current through P.L. 114-112 (excluding 114-92, 114-94 and 114-95) approved 12-18-2015

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-1**

Case: 15-15355    Date Filed: 01/22/2016    Page: 56 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

25 Syracuse J. Int'l. L. & Com. 1

**Syracuse Journal of International Law and Commerce**
Spring 1998

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN AND INTERNATIONAL
TRIBUNALS: SECTION 1782 OF TITLE 28 OF THE U.S.C. REVISITED

Hans Smit [a1]

Copyright (c) 1998 Syracuse Journal of International Law and Commerce; Hans Smit

### I. Introduction

In 1964, the United States Congress enacted a revised version of section 1782 of Title 28 of the United States Code, entitled
"Assistance to foreign and international tribunals and to litigants before such tribunals." [1] This revision had been prepared
by the Columbia Law School Project on International Procedure, of which I was the Director, and the U.S. Commission and
Advisory Committee on International Rules of Judicial Procedure, to which I functioned as the Reporter. [2] It was part of an
overall revision of American rules for obtaining and giving of assistance to litigants involved in international adjudication
undertaken by the Columbia Project and the U.S. Commission and Advisory Committee. [3]

The 1964 revision of Section 1782 was a drastic one. It substituted one succinct section for a number of sections in the United
States Code that had rarely found practical application. [4] The revised section 1782 greatly liberalized assistance given to foreign
and international litigants and tribunals and, in the thirty-five years that followed its enactment, has been applied in scores of
cases. [5] All too frequently, the development **\*2** of considerable case law bears testimony to deficiencies in statutory text.
But, as I hope to demonstrate, that is not the case here. The statutory text is straightforward and clear. The case law it has
spawned has been caused by judicial unwillingness to give it the meaning that an unbiased reading requires. The reasons for
this unwillingness have not always been clearly expressed. They include a reluctance to add to the burdens of already overtaxed
courts, [6] a lack of understanding of adjudicatory processes in foreign and international tribunals, [7] and, in some measure, a
distrust of those processes. [8]

Now that thirty-five years have passed, it seems appropriate that we evaluate in greater detail the developments under a provision
that has led to a good deal of litigation and evoked widespread comment. [9]

It is a fortuitous circumstance that this time span of thirty-five years is the same in which I have had the great pleasure and
privilege of collaborating with Peter Herzog, to which this article, and the issue in which it appears, are dedicated. When, in
1960, I returned to Columbia to direct the Project on International Procedure, Peter had just completed his work towards a
Master's Degree under the direction of W.L.M. Reese, the Reporter of the Restatement (Second) of Conflict of Laws and one
of this nation's greatest scholars and teachers, who had also been my mentor. When I was asked to direct the Project, I thought
that what we then called "international judicial assistance" was too limited a subject and that the Project should undertake
comparative studies of selected foreign systems of civil procedure. In the first instance, we selected French, Italian, and Swedish
procedures as suitable for comparative treatment. Professor Reese, who described Peter as one of the brightest men he knew,
urged that we seek to persuade him to take **\*3** on the French system and, in due course, Peter produced his opus magnificum,
entitled "Civil Procedure in France." [10]

**ADD-2**

Case: 15-15355    Date Filed: 01/22/2016    Page: 57 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

When the work on the Columbia Project on International Procedure had been completed, we organized a Project on European Legal Institutions under a Ford Foundation grant. Again, we turned to Peter to seek his collaboration on a multi-volume work on the European Economic Community that bears his and my name. [11]

Having worked with Peter on projects in the areas of international law and international procedure, it would appear appropriate that I deal, in a volume dedicated to him, with a subject that has always remained the focus of his intellectual and academic endeavors: the interaction of laws on the multi-state level. [12]

## II. The Precursor of Section 1782 and Its Present Version

The present version of Section 1782 deals in one section with what had previously been the subjects of separate treatments: The assistance to international tribunals had been addressed in Sections 270 through 270C of the Title 22 of the United States Code, [13] while that rendered for foreign courts and litigants had been covered by Sections 1782 and 1785 of Table 20 of the United States Code. [14] The 1964 Revision deals with both types of assistance in one encompassing section. As may become clear, this amalgamation does have a bearing on the proper construction of new Section 1782. [15]

I will not deal here with the details of the changes that new Section 1782 brought. They have been described in earlier publications. [16] In the following, primary consideration will be given to the constructions given to Section 1782 by the courts. My conclusion will be that, on the whole, Section 1782 has served its intended purpose, that, on occasion, some courts have given it a construction that is at odds with both its clear text and evident purpose, but that it is reasonable to expect that, over time, **\*4** the courts and commentators will fall into line and will apply Section 1782 in a manner consistent with its purpose of facilitating the conduct of litigation with international aspects.

## III. The Principal Elements of Section 1782

Section 1782 provides:

> Assistance to foreign and international tribunals and to litigants before such tribunals

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath an take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

(b) This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

Case: 15-15355    Date Filed: 01/22/2016    Page: 58 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

The elements that deserve more detailed consideration are the following:

    (1) on behalf of which tribunals and litigants may the evidence be sought;


(2) when is assistance to be rendered to arbitral tribunals;

(3) to which persons may the court's order be addressed;

(4) must the evidence be located in the United States;

(5) what is the relevance of foreign rules of evidence;

 **\*5**  (6) what must be the intended use of the evidence;

(7) how should the court exercise its discretion;

(8) what is the procedure under Section 1782;

(9) what are the applicable privileges;

(10) what is the significance of Subsection (b);

(11) what is the relation to The Hague Evidence Convention?


### IV. The Tribunals and Litigants to Which Assistance May Be Granted

The precursor of Section 1782 provided for the taking of a deposition "to be used in any judicial proceeding pending in any court." [17]  Under that version, the assistance to be rendered therefore had to be in aid of a judicial proceeding in a court. However, the present version of Section 1782 provides for assistance for use in "a foreign or international tribunal." The substitution of the word "tribunal" for "court" was deliberate, for the drafters wanted to make the assistance provided for available to all bodies with adjudicatory functions. [18]  Clearly, private arbitral tribunals come within the term the drafters used. [19]  This is also confirmed by the legislative history. New Section 1782 was expanded also to cover the assistance provided for in Sections 270-270C of Table 22 of the United States Code. This assistance was available to international tribunals established pursuant to an international agreement to which the United States was a party. Clearly those tribunals included international arbitral tribunals. Indeed, sections 270-270C of 22 United States Code were enacted especially for the purpose of providing for assistance to an international arbitral tribunal. [20]  New Section 1782 not only intended to continue the provision for this assistance, but eliminated the requirement that the international tribunals be established by agreement to which the United States is a party. Indeed, the broad term "international tribunal" was intended to cover all international arbitral tribunals.

Notwithstanding this fulsome support for giving a broad reading to the term "tribunal" as it appears in Section 1782, some courts have failed to do so. In In re Letters Rogatory Issued by the Director of  **\*6**  Inspection of the Government of India, [21]  Judge Friendly, writing for the Second Circuit, ruled that Section 1782 could not be used to obtain evidence for use in an Indian proceeding to fix a tax assessment that could be appealed to appellate tribunals. [22]  More recently, Judges Duffy and Sweet, of the Southern District, have ruled that the term "tribunal" does not include an international arbitral tribunal. [23]  These decisions are most regrettable. They run counter not only to the plain meaning of the term, to Section's 1782 legislative history, and to the clear purpose of that Section to facilitate evidence gathering in foreign and international adjudication.

Case: 15-15355   Date Filed: 01/22/2016   Page: 59 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

As will be explained below, special caution is appropriate in regard to requests for assistance in adjudication by arbitral tribunals, but that is because of the special concern courts should show for not interfering with the arbitral process.[24] In the case decided by Judge Duffy, however, it was the arbitrator who requested assistance. Compliance with the request would therefore further, rather than frustrate, the arbitral process. Judge Duffy's decision not only does not take this circumstance into account, but also fails to consider the desirability of promoting international arbitration by extending to international arbitral tribunals the same assistance that is granted to other international tribunals. Leading decisions by the U.S. Supreme Court, like those in Scherck[25] and Mitsubishi,[26] leave no doubt that international arbitration is a specially favored institution. The decisions by Judges Duffy and Sweet fail to give consequence to this judicially pronounced favor. On the contrary, they put international arbitral tribunals in a disfavored position.

While the term "tribunal" in Section 1782 includes an arbitral tribunal created by private agreement,[27] another question is what tribunals are "international" within the sense of Section 1782. Judge Duffy, in his Medway opinion,[28] advanced the argument that, if Section 1782 were construed to reach privately formed international arbitral tribunals, it  **\*7**  would provide for assistance to foreign arbitrations that is not extended to domestic arbitrations and that that would be improper. This argument fails for a variety of reasons.

First, Section 1782 seeks to deal only with assistance to foreign and international tribunals, not with assistance to purely domestic tribunals. The latter subject lay without the purview of the task assigned to the Commission and the Columbia Project. Indeed, when I prepared the revision to Rule 4 of the Federal Rules of Civil Procedure for the Commission and the Project relating to service of judicial documents abroad and provided for service by a non-party over eighteen years of age,[29] I was firmly convinced that a provision to that effect would also be most desirable in the domestic context. I decided, however, that proposal of a provision to that effect would carry us beyond our bailiwick and that, if our proposal would work well in the international context, it would in due course also be adopted in the domestic context. Our expectation in that regard proved to be well-founded, and the Federal Rules of Civil Procedure now provide for such service across the board.[30]

I similarly believe that the assistance provided to international and foreign tribunals should also be extended to domestic tribunals and that, if it is not, it should be.[31] But the possible absence of desirable assistance to domestic arbitration tribunals may not reasonably be used as an argument for giving an unduly narrow construction to a statutory provision that, on its face, does grant such assistance to international arbitral tribunals.

Second, Section 1782 is not, as Judge Duffy erroneously assumes, limited to foreign, as distinguished from domestic, arbitrations. It provides for assistance to an "international tribunal". An international arbitral tribunal may also conduct its business in the United States. When it does, recourse to Section 1782 is available to it. Of course, this raises the question of what renders a tribunal international in the sense of Section 1782. In line with the purpose of Section 1782 to provide broad and liberal assistance, the term "international" should be given the broadest possible construction. Accordingly, a tribunal is international in the sense of Section 1782 when any of the parties before it, or any of the arbitrators, is not a citizen or resident of the United States. Similarly, a tribunal should be regarded as foreign within the purview of  **\*8**  Section 1782 when it is held anywhere outside the United States or is created under the law of a foreign country.

### V. When Assistance to Arbitral Tribunals is to be Rendered

As stated above, Section 1782 does apply to international arbitral tribunals created by private agreement.[32] But this does not mean that assistance to international arbitral tribunals should be provided in the same circumstances in which it is extended to foreign courts. The purpose of Section 1782 is to provide liberal assistance to foreign and international tribunals, but this assistance should not be provided when it would interfere with the orderly processes of the foreign or international tribunal. This, of course, raises a question of foreign law that, in the generality of cases, should be left for the foreign or international

**ADD-5**

Case: 15-15355 Date Filed: 01/22/2016 Page: 60 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L.....

tribunal to decide. [33] The reason for this is that an application under Section 1782 should not burden the American court with the ordinarily difficult task of determining the relevant foreign law. Recourse to Section 1782 should be left as simple as possible in order to keep the provision of assistance to foreign and international speedy and efficient. The American court should refrain from passing on questions of foreign law [34] when these can quite properly be left to the foreign or international tribunal which is necessarily the ultimate judge of whether the evidence can properly be used in its own forum. [35] And it may also safely be assumed that a litigant before a foreign or international tribunal will carefully consider whether it will be able to use the evidence in the foreign or international tribunal before it expends the effort and expense involved in seeking evidence pursuant to Section 1782.

These considerations do not apply with the same force to international arbitral tribunals. One of the great advantages of arbitration is that it leaves a great deal of freedom to the tribunal and the litigants to tailor the procedure to the needs of the particular case. This procedure will normally not be known before the tribunal and the litigants have had an opportunity to lay down the particular procedure they wish to be followed. The parties can therefore not make any judgment as to whether recourse to Section 1782 would be compatible with the tribunal's procedure. And once the tribunal has determined what procedure is to be followed, the parties can easily address the tribunal with the request that **\*9** it approve of a proposed application under Section 1782. Accordingly, the rule in relation to international arbitral tribunals should be that American court should honor an application under Section 1782 only if the application is approved by the arbitral tribunal. Judge Griesa, in an admirably reasoned decision, so ruled in In re Technostroyexport, [36] in which he also properly stressed that the parties, by agreeing to arbitration, had agreed to abide by the arbitrator's rules.

A different result was reached by Judges Duffy and Sweet, [37] who ruled that private arbitral tribunals were not covered by Section 1782 at all. [38] The result reached by Judge Sweet is compatible with the analysis defended here, since in the case he adjudicated the arbitral tribunal had not approved the application. [39] The same is not true of the application addressed to Judge Duffy, which had been made upon a ruling by the arbitrator that "directed that GE's documents are relevant and necessary for the fair determination of the dispute." [40] As already indicated, Judge Duffy's ruling disregards the plain text, the legislative history, and the evident purpose of Section 1782. [41]

### VI. Persons Reached by Section 1782

Section 1782 provides for a district court of a district "in which a person resides or is found" to order the production of evidence for use in a foreign or international tribunal. Thus far, the precise meaning of the quoted terms has not occasioned controversy. But, in a future case, a person addressed by an order to produce evidence may raise the question of whether it is subject to the district court's authority. The answer to that question is not immediately clear. There are no generally prevailing rules of in personam competence to which Section 1782 might be argued to refer. The quoted language must therefore be given its own meaning.

The purpose of Section 1782 is to liberalize the assistance given to foreign and international tribunals. [42] The language defining its in personam reach must therefore be given a liberal construction commensurate with that purpose. This means that a person should be regarded as **\*10** residing in the district not only when it is domiciled there, but also when it is resident there in the sense of residing in the district for some not insignificant period of time. Indeed, if the relationship of the person addressed to the district is such as to warrant the exercise of in personam authority under the due process clause, it should be regarded as "resident" there. [43]

The same is true of the term "found." The evident statutory purpose is to create adjudicatory authority based on presence. [44] Insofar as the term applies to legal rather than natural persons, it may safely be regarded as referring to judicial precedents that equate systematic and continuous local activities with presence. [45]

**ADD-6**

Case: 15-15355    Date Filed: 01/22/2016    Page: 61 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

## VII. The Location of the Evidence

The question has arisen whether Section 1782 can be used to compel production of tangible evidence located outside the district and, more particularly, in a foreign country and to compel testimony by witnesses outside of the district or in a foreign country. Section 1782 does not address this question in explicit terms. However, by creating adjudicatory authority over persons who may possess tangible evidence abroad [46], Section 1782 might be argued to provided a statutory basis for production of evidence located abroad.

The issue arose in In re Sarrio S.A., involving an action before a Spanish court between Spanish parties, in which the plaintiff sought an order in the United States Court for the Southern District of New York to compel Bank America and "its direct and indirect subsidiaries and **11** affiliates" to produce documents, and testimony by witnesses, located in Spain and Great Britian. [47]

The drafters of Section 1782 did not anticipate recourse to Section 1782 for this purpose. Furthermore, there are potent reasons for not giving Section 1782 the extraterritorial effect sought in this case. [48]

First, the evident purpose of Section 1782 is to make available to foreign and international tribunals and litigants evidence to be obtained in the United States. Thus, a harmonious scheme is established: Evidence in Spain is obtained through proceedings in Spain, evidence in Great Britian is obtained through proceedings in Great Britain, and evidence in the United States is obtained through proceedings in the United States.

Second, Section 1782 was not intended to enable litigants to obtain in Spain evidence located in Spain that could not be obtained through proceedings in Spain. [49] Section 1782 should not be used to interfere with the regular court processes in another country. Furthermore, such use would produce its effects haphazardly, because recourse to it would be available only to a party that could find a person resident or "found" in the United States, which controlled, directly or indirectly, evidence located abroad.

Third, if Section 1782 could be used for this purpose, American courts would become clearing houses for requests for information from courts and litigants all over the world in search of evidence to be obtained all over the world. And the burden to produce that information would be imposed on persons in the United States who have operations abroad. With American banks and financial institutions doing business all over the world, finding such a person would be relatively simple. [50] It is no coincidence that most of the cases concerning the production of evidence to be produced or to be obtained abroad have involved banks doing business in the United States and abroad. [51] Federal courts and **12** American business should not be saddled with such significant burdens in the absence of a legislative intent clearly expressed. [52]

Fourth, if American courts were to assume the role of clearing houses for world-wide information gathering, conflicts with foreign countries would inevitably arise. These conflicts have already arisen when American courts and litigants seek information abroad for use in American courts. [53] They would be substantially aggravated if American courts were to seek to impose their information gathering procedures, generally unknown in foreign countries that do not belong to the family of common law systems. It is one thing for American court to insist that its procedures be used in aid of American litigation but quite another to impose them on actions brought in foreign courts.

In In re Application of Sarrio S.A., [54] Judge Paterson denied an application under Section 1782 made for the purpose of obtaining evidence in Spain for use in Spanish proceedings. The Second Circuit, per Judge Leval, reversed, but on the ground that the bank that was asked to produce the evidence did not object to doing so. Noting that "there is reason to think that Congress intended to reach only evidence located within the United States" Judge Leval ruled that, since the bank was prepared to produce the evidence, it is "unnecessary for us to decide... the geographical reach of Section 1782." Essentially, therefore, the case

ADD-7

Case: 15-15355    Date Filed: 01/22/2016    Page: 62 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

became one involving application of subsection (b) which provides that any person within the United States may voluntarily give testimony or produce tangible evidence before any person and in any manner acceptable to him. [55]

Of course, even if Section 1782 were read to apply to the situation addressed in Sarrio, the court asked to compel the production of the evidence should, for the reasons detailed above, exercise the discretion that Section 1782 indubitably gives it to refuse to comply with the request. [56]

### *13  VIII. The Extent of the Relevance of Foreign Rules Relating to the Production of Evidence

Without any warrant or support that can be found in the text of Section 1782, some courts have ruled that Section 1782 does not authorize production of evidence that cannot be compelled under the law of the foreign or international tribunal. [57]  It should be stressed that the courts that have so ruled have not drawn sharp distinctions between non-discoverability and non-admissibility under foreign law. [58]  Whatever the criterion used, it should be regarded as irrelevant. Section 1782 does not make discoverability or admissibility under foreign law a prerequisite to proper recourse to Section 1782, and the court should not seek to render less liberal the assistance the legislator so clearly prescribed. Fortunately, the Second Circuit, which is likely to be most frequently addressed with requests for assistance under Section 1782, has ruled discoverability or admissibility under foreign law not to be a general prerequisite to assistance under Section 1782. [59]

It should be noted that this does not mean, that a court, asked to provide assistance under Section 1782, should never consider non-discoverability or non-admissibility under foreign law. For example, in order to create equality of treatment, an American court, when asked to compel production by a litigant before a foreign or international tribunal, may condition discovery on that litigant's agreeing to make the same extent of discovery available to its opponent. [60]  In addition, an American court may properly take into account a foreign or international tribunal's ruling that the evidence sought should not be produced. [61]  I have dealt with these questions in greater detail in earlier publications. [62]  I should note, however, that foreign courts are increasingly recognizing that non-discoverability under their own laws should not preclude recourse to Section 1782. Both English and Dutch courts have so ruled. [63]  However,  *14  when a foreign or international tribunal has ruled that production of the evidence pursuant to Section 1782 would not be appropriate, an American court should heed that ruling and deny the application. [64]

### IX. The Intended Use of the Evidence Sought

Section 1782 requires that the evidence be sought "for use in a proceeding in a foreign and international tribunal." In two cases, the Second Circuit, in other respects a paragon of liberal construction of Section 1782, has given the quoted words an unduly limited interpretation. In the first, [65]  Judge Friendly reversed a lower court's order appointing a commissioner to take evidence sought by an Indian inspector of taxes. Judge Friendly stressed that the inspector did not come within the statutory terms. I have already criticized this decision as paying insufficient attention to the adjudicatory nature of the proceedings before the inspector and its disregard of the possible use of the evidence sought in proceedings before appellate tribunals. [66]  In the second case, [67]  Judge Newman, rejecting my views, ruled that Section 1782 is applicable only if the foreign proceeding is "imminent, i.e., very likely to occur within a brief interval..." [68]

Fortunately, Judge [now Justice] Ginsburg, writing for the District of Columbia Circuit Court of Appeals, rejected an attempt to put an unduly constraining construction on Section 1782 by upholding a lower court's holding that an English prosecutor could have recourse to Section 1782, even though no proceedings before an English court were pending, as long as such proceedings were "within reasonable contemplation." [69]  Indeed, the 1964 revision of Section 1782 deliberately eliminated the requirement that the proceedings in the foreign tribunal be "pending." This was done in recognition of the fact that the proper gathering of evidence before a proceeding is commenced may serve the wholesome purpose of avoiding litigation altogether.

Case: 15-15355   Date Filed: 01/22/2016   Page: 63 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

**\*15  X. The Court's Discretion Under Section 1782**

Section 1782 provides that a district court "may" order the production of evidence in aid of a proceeding in a foreign or international tribunal. The term "may" was used deliberately to afford the court the opportunity of refusing assistance, or conditioning it upon compliance with conditions, when this was deemed appropriate. As already indicated, a district court should normally exercise its discretion to refuse assistance to a private international arbitral tribunal, unless a request for such assistance is approved by the tribunal. [70] In addition, a district court should exercise its discretion to ensure that a litigant not obtain a one-sided advantage from the fortuitous circumstance that relevant evidence favorable to that litigant is under the control of a person residing or found in the United States. [71] And a district court should also use its discretion to refuse assistance to compel production of evidence located in a foreign country under the control of a person in the United States in an action between foreign litigants in a foreign country. [72]

A refusal to grant assistance under Section 1782 may also be based on the district court's finding that, in some way, the foreign proceedings are unfair or incompatible with domestic notions of propriety. But caution in that regard is warranted, because American courts should not condemn foreign proceedings merely because they are different from those conducted in, or unknown to, American courts.

**XI. Procedure under Section 1782**

Section 1782 provides that the district court may prescribe the procedure to be followed in the production of the evidence and that, unless the court prescribes otherwise, the procedure prescribed by the Federal Rules of Civil Procedure shall be followed. Taken literally, Section 1782 prescribes only the procedure to be followed in taking testimony and producing tangible evidence and does not address the procedure to be followed in obtaining the order directing the production of the evidence. On reflection, it would have been better to provide that, unless the court directs otherwise, all procedures under Section 1782 are to  **\*16** conform to the Federal Rules of Civil Procedure. That, clearly, was the intention of the drafters. [73]

The reported cases reflect that, in actual practice, application for assistance under Section 1782 are frequently filed ex parte. This may result in an order's being issued without notice to either adverse parties or contemplated parties in the foreign or international tribunal or to the person to whom the order is to be directed. Normally, this will cause no substantial harm, since, when the order is brought to the attention of the person ordered to produce the evidence, that person can move to vacate the order if it has been improperly issued. And that person may also inform adverse parties in the foreign or international tribunal of the order's issuance. However, the person against whom the order has been issued will then have the burden of filing a motion to vacate the order rather than merely oppose the initial application. And that person may, but also may not, inform parties adverse to the applicant.

Since it is an elementary precept of due process that a person on whom an obligation is to be judicially imposed should have an opportunity to defend before the obligation is imposed, [74] ex parte applications are improper, and adequate notice of the application should be given both to the person who is to produce the evidence and to adverse parties. [75]

In actual practice, courts appear to have overlooked the impropriety of recording ex parte applications, perhaps on the ground that, by the time an application to vacate the order is being considered, it would involve duplication of time and effort to force the refiling of the original application for assistance. But that is not an adequate reason for overlooking an unconstitutional error. At the least, the court should consider assessing costs and attorney's fees against the party that made the original application. [76]

**\*17**  It may be questioned whether notification of adverse parties, as distinguished from the person to whom the order is to be directed, is necessary. After all Subsection (b) of Section 1782 provides that the person from whom the evidence is sought

**ADD-9**

Case: 15-15355    Date Filed: 01/22/2016    Page: 64 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L. ...

may voluntarily produce it, regardless of the wishes of adverse parties. Subsection (b), however, is written for the situation in which a person voluntarily, and without a court order, produces the evidence. In that case, notice to adverse parties is not required. [77] But the situation is different when a court order is sought. It cannot be denied that the issuance of such an order imposes an obligation on the person to whom the order is addressed and that compliance with that obligation may affect the interests of adverse parties in the proceeding before the foreign or international tribunal. That being so, the adverse parties should be notified. [78] Such notification may also alleviate the burdens of the person from whom the evidence is sought. In the generality of cases, that person can rely on the adverse party's contesting the application and need not expend the money and effort to contest the application itself.

## XII. Applicable Privileges

The last sentence of Section 1782(a) provides that a person may not be required to produce evidence" in violation of any legally applicable privilege." The quoted language is deliberately open-ended. It refers to any legally applicable privilege, but does not specify what that privilege may be. The drafters wished to leave it to the district court to determine which privileges, under pertinent conflict of laws rules, were to be applied. Whenever a plea of privilege is raised under Section 1782, the court must therefore determine which evidence is allegedly shielded from disclosure and whether, in applying appropriate choice of law rules, there is an applicable privilege rule precluding production of the evidence. [79]

In the Sarrio case, Judge Leval did not follow the analysis indicated by Section 1782. The evidence of which production was sought were documents under the control of the bank in Spain and Great Britain. The bank caused these documents to be transported to New York to enable the bank's counsel to evaluate whether they should be produced. Judge Leval's analysis focused on whether the evidence was covered by the **18** attorney-client privilege under American law. The appropriate analysis would have focussed on whether the documents that were located in Spain and Great Britain were covered by a privilege extended by Spanish or English law. After all, the bank should not be able to bring the documents within the reach of an American privilege by bringing them to New York. Whether the bank was free to produce the documents could therefore have been decided under the law of the place that had the most significant relationship to the issue, which would appear to be the place where the evidence was located at the time its disclosure was sought. [80] Of course, the prevailing choice of law rule in the United States in that American courts apply the law of the forum in determining whether the attorney client privilege applies. [81] But in the Sarrio case, the claim that the attorney-client privilege stood in the way of production could hardly be regarded as serious, since the documents were put in the hands of the bank's attorney in New York after their production was sought. [82] A more respectable argument would have been that the bank was obligated to maintain confidentiality under the agreement with its customer. That question had to be decided under the law of the place where the relationship was created and existed at the time production was sought. If, under the applicable foreign law, the information was privileged or covered by an obligation of confidentiality, the district court should not order its production.

## XIII. Subsection (b)

Subsection (b) of Section 1782 provides that any person may voluntarily produce evidence for use in a foreign or international tribunal. Of course, this does not give a person the freedom to produce evidence that, under applicable law, it may not produce. [83] Its purpose is to make clear that the United States creates no obstacles, such as undue reliance on sovereignty, to the voluntary production of evidence. [84] Nor does Subsection (b) mean that an interested party may not seek to preclude a **19** person from giving evidence that, under applicable law, the person seeking the evidence is precluded from seeking. [85]

As already indicated, Subsection (b) is not applicable when a district court orders the production of evidence pursuant to Subsection (b), for that production cannot properly be regarded as voluntary. [86]

**ADD-10**

Case: 15-15355    Date Filed: 01/22/2016    Page: 65 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

### XIV. The Relation to the Hague Evidence

It might be argued that, in relations with foreign countries that have ratified The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, that Convention provides the exclusive procedures for obtaining evidence in the United States for use in a court located in a Convention country. The analogous argument has been advanced by a number of states that have ratified The Hague Evidence Convention when American litigants have tried to obtain evidence located in those states. [87] Indeed, it may be regarded as somewhat surprising that no case has yet been decided in which that argument has been advanced. Fortunately, the Supreme Court has ruled that The Hague Evidence Convention is not exclusive. [88] It is therefore reasonable to assume that it will rule similarly when the evidence is to be obtained in the United States.

In any event, The Hague Evidence Convention should not be construed to stand in the way of recourse to Section 1782. The purpose of Section 1782 is to provide liberal assistance. It would be anomalous, to say the least, if a Convention that purports to facilitate international judicial assistance were construed to impede it.

### XV. Conclusion

All in all, Section 1782 has largely served the purposes for which it was enacted. American courts have, upon occasion, given it a more restricted construction than warranted by either its text or the legislative *20 history, but there appears to be no reason for seriously considering, at this time, any statutory amendments. [89]

### Footnotes

a1      Copyright by Hans Smit, Fuld Professor of Law, Columbia University.

1       28 U.S.C. § 1782 (1996).

2       On the co-operation between the Project and the Commission, see Hans Smit, Assistance Rendered by the United States in Proceedings Before International Tribunals, 62 Colum. L. Rev. 1264-65, n.7 [hereinafter Smit, Assistance].

3       On the work of the Project and Commission generally, see International Co-Operation in Litigation: Europe, col. 1 (Hans Smit, ed., The Hague, 1965).

4       On the precursors of § 1782, see Smit, Assistance, supra note 2, at 1264; Hans Smit, International Litigation Under the United States Code, 65 Colum. L. Rev. 1015, 1026-35 (1965)[hereinafter Smit, International Litigation].

5       For commentatorial treatment of these cases, see Hans Smit, Recent Developments in International Litigation, 35 S. Tex. L. Rev. 215 (1994) [[hereinafter Smit, Recent Developments ]; Lawrence W. Newman & Michael Burrows, The Practice of International Litigation 251 (1993); Robert H. Smit, The Sarrio Decision, 12 IBA Civ. Litig. Newsl. No. 5 (1996); Peter D. Troobof & Bradford L. Smith, Judicial Assistance-Foreign Criminal Investigations. Evidence "For Use in a Proceeding", 3 Am. J. Int'l L. 929 (1989); Walter B. Stahr, Discovery Under 28 U.S.C. Section 1782 For Foreign and International Proceedings, 30 Va. J. Int'l L. 597 (1990); Edward C. Weiner, In Search of International Evidence: A Lawyer's Guide Through the United States Department of Justice, 58 Notre Dame L. Rev. 60 (1982); Brian E. Bomstein & Julie M. Levitt, Much Ado About 1782; A Look at Present Problems in the Discovery in the United States for Use in Foreign Litigation Under 28 U.S.C. Section 1782, 20 U. Miami Inter-Am. L. Rev. 429 (1989); Eileen P. McCarthy, A Proposed Litigation Standard for U.S. Courts in Granting Requests for International Judicial Assistance, 15 Fordham Int'l L. J. 772 (1992).

6       See Judge Feinberg in Malev Hungarian Airlines v. United Technologies, Inc., 964 F. 2d 97 105 (2d Cir. 1992) (dissenting in the case by noting that the liberal assistance sought would unduly add to the burdens of already overtaxed courts).

Case: 15-15355    Date Filed: 01/22/2016    Page: 66 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

7    Civil law courts generally do not provide for American-style discovery and do not rule on admissibility of evidence, particularly documentary evidence, at the time it is submitted. Furthermore, foreign procedural systems permit recourse to other ways of inducing a party or witness to produce the evidence. See Smit, Recent Developments, supra note 5, at 236-37, n. 96.

8    This may have played a role in Judge Friendly's decision in In The Matter of Letters Rogatory Issued by the Director of Inspection of the Government of India, 385 F.2d 1017 (2d Cir. 1967). See also text accompanying notes 21-22 infra.

9    See supra note 5.

10   Peter Herzog, Civil Procedure in France (with Martha Weser, 1967). It remains the only work in English on the subject. In the same series, the Project published Mauro Cappelletti & Joseph Perillo, Civil Procedure in Italy (1965); Ruth Bader Ginsburg & Anders Bruzelius, Civil Procedure in Sweden (1965); Takaaki Hattori & Dan Fenno Henderson, Civil Procedure in Japan (1983, loose-leaf).

11   Hans Smit & Peter Herzog, The Law of the European Economic Community (loose-leaf, 7 volumes).

12   For many years, Peter published his annual reviews of decisions by New York courts in conflict of laws cases, which rank among the best publications in the area.

13   On these sections, see Smit, Assistance, supra note 2, at 1264.

14   On the precursors of § 1782, see Smit, International Litigation, supra note 4, at 1026-35.

15   See the text accompanying notes 18-26 infra.

16   See Smit, International Litigation, supra note 4, at l.c.

17   See id. at 1026-27, n.72.

18   See id. at 1021, n.36.

19   Accord Smit, Assistance, supra note 2, at 1264.

20   Id.

21   In re Letters Rogatory Issued by the Director of Inspection of the Government of India, 385 F. 2d 1017 (2d Cir. 1967).

22   On this case, see also Smit, Recent Developments, supra note 5, at 233.

23   In re Medway Power Ltd., 1997 U.S. District LEXIS 18553 (Judge Kevan T. Duffy, S.D.N.Y., Nov. 20, 1997); In re National Broadcasting Co., 1998 U.S. Dist. LEXIS 385 (Judge Robert Sweet, S.D.N.Y., Jan. 16, 1998).

24   See text accompanying notes 32-41 infra.

25   Scherk v. Alberta-Culver Company, 417 U.S. 506, 94 S. Ct. 2449, 41 L. Ed. 2d 170 (1974).

26   Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S. Ct. 3346, 7 L. Ed. 2d 444 (1985). On this decision, see Hans Smit, Mitsubishi: It's Not What It Seems To Be, 4 J. Int. Arb. 7 (1987)

27   See text at notes 18-26 infra.

28   In re Medway Power Ltd., 1997 U.S. District LEXIS 18553.

29   On the 1963 revision of Rule 4 of the Federal Rules of Civil Procedure, see International Co-Operation in Litigation: Europe, supra note 3, at 10-11 (Nijhoff, 1965).

30   Fed. R. Civ. P. 4 (i).

31   Section 1782 does extend to international arbitral tribunals sitting in the United States. See text following this footnote. In purely domestic cases, courts may well be argued to possess inherent power to issue subpoenas in aid of arbitral tribunals sitting in sister states.

Case: 15-15355    Date Filed: 01/22/2016    Page: 67 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

32    See text accompanying notes 23-26 supra.

33    See text accompanying notes 57-59 infra.

34    For a more detail justification for this judicial abstention, see Smit, Recent Developments, supra note 5, at 235-36.

35    See Smit, International Litigation, supra note 4, at l.c.

36    An opinion to that effect by the author was submitted in the NBC case. In re National Broadcasting Co., 1998 U.S. Dist. LEXIS 385.

37    In re Technostroyexport, 853 F. Supp. 695 (S.D.N.Y.1994).

38    See cases cited supra note 23.

39    In the Medway case, I had provided an opinion to the effect that the application should be denied on that ground.

40    Medway, 1997 U.S. District LEXIS 18553, at *3.

41    See supra text accompanying notes 18-22.

42    Smit, International Litigation, supra note 4, at 1026-27.

43    The United States Code, after its 1948 revision, speaks of "residence" and "residents" whenever the pertinent criterion is either domicile or residence. The revision of § 1783 and 1784 of Title 28 added residence as a basis for in personam adjudicatory authority on the assumption that the courts would exercise in personam adjudicatory authority whenever the physical relationship to the United States of the person subpoenaed was such as to render it constitutional to exercise such authority over him or her.

44    But mere transient presence is not sufficient. Whatever one may think of the propriety of using transient presence as a basis for in personam adjudicatory authority in an ordinary action to recover on a personal obligation. Cf. Burnham v. Superior Court of California, 495 U.S. 604, 110 S. Ct. 2105, 109 L. Ed. 2d 631, (U.S. Cal., May 29, 1990) (NO. 89-44) mere transient presence is not a reasonable basis for exercising adjudicatory authority on behalf of a foreign and international tribunal.

45    For such cases, see Maurice Rosenberg, et al, Elements of Civil Procedure 255-57 (5th ed. 1990)

46    Persons resident or found within the United States may have in their possession or under their control evidence located abroad. It has long been recognized that such persons may be required to produce such evidence in actions in courts in the United States. See, e.g., Société Nationale Industrielle Aerospatiale v. U.S. District Court of Southern District Iowa, 482 U.S. 522, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987); United States v. First National City Bank, 396 F. 2d 97 (2d Cir. 1968)

47    In re Sarrio S.A., 1995 WL 598988 (S.D.N.Y. Oct. 11, 1995) rev'd 119 F. 3d 43 (2d Cir. 1997). On this case, see Robert H. Smit, The Sarrio Decision, supra note 5.

48    The analysis that follows is drawn from an expert opinion I submitted in the Sarrio case.

49    A sharp distinction should be made between recourse to § 1782 to obtain evidence located in the United States for use in a proceeding abroad and recourse to § 1782 to obtain evidence located in a foreign country for use in that action. It is the latter situation that was addressed in Sarrio.

50    In fact, since probably all of the major banks in the world can be "found" in the United States, it would be most likely that in any proceeding in any foreign country evidence located in that country could be sought by recourse to § 1782 if that section were given extraterritorial effect.

51    See, e.g., United States v. The Bank of Nova Scotia, 691 F. 2d 1384 (11th Cir. 1982), cert. denied, 462 U.S. 1119,103 S. Ct. 3086, 77 L. Ed 2d (1348 1983); United States v. First National City Bank, 379 U.S. 378, 85 S. Ct 520, 13 L. Ed 2d 365 (1965). See further Louis Henkin et al, International Law 1098-1108 (3d ed. 1993).

ADD-13

Case: 15-15355    Date Filed: 01/22/2016    Page: 68 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L.....

52    It should be acknowledged that the statutory text does not provide explicitly that § 1782 has no extraterritorial effect. See Robert H. Smit, The Sarrio Decision, supra note 5. However, the statutory text does not preclude the construction advocated here either. In any event, the court may use its discretion to reach the same result. See infra text accompanying notes 70-72.

53    See supra cases cited in note 51.

54    See supra note 47.

55    See also infra text accompanying notes 83-86.

56    See infra text accompanying notes 71-72.

57    See, e.g., In re Asta Medica, S.A., 981 F. 2d 1 (1st Cir. 1992); 15. Lo Ka Chun v. Lo To, 858 F.2d 1564 (11th Cir.(Fla.), Nov 08, 1988) (NO. 87-6098); Smit, Recent Developments, supra note 5, at 236-38.

58    On this distinction, see Smit, International Litigation, supra note 4, at l.c.

59    Malev Hungarian Airlines v. United Technologies, Inc., 964 F. 2d 97 (2d Cir.), cert. denied, 113 S. Ct. 179 (1992); Foden v. Aldunate, 3 F. 3d 54 (2d Cir.), cert. denied, 114 S. Ct. 443 (1993).

60    Of course, this requirement can be imposed only on a party, not on witnesses not subject to the American court's adjudicatory authority.

61    This aspect arose in the Enron Litigation, in which the English High Court upheld an injunction issued by a lower English court. On this decision, see Enron Corp. v. Amoco Corp., Case No. 96-20735 (5th Cir. 1997).

62    See Smit, Recent Developments, supra note 5 at 236-38.

63    The leading English case is South Carolina Ins. Co. v. Assurantie Maatschappij De Zeven Provincien N.V., (1987) 1 App. Cas. 24, in which the House of Lords ruled that the non-discoverability under English law did not stand in the way of an English court's or litigant's seeking assistance in the United States under § 1782. A similar decision was rendered by the President of the Amsterdam District Court.

64    See supra text accompanying note 61.

65    See supra note 21.

66    See Smit, Recent Developments, supra note 5, at 233

67    In re Request for International Judicial Assistance (Letter Rogatory) for the Federal Republic of Brazil, 936 F. 2d 702 (2d Cir. 1991).

68    936 F. 2d. at 703. For additional commentaries on this decision, see authorities cited in Smit, Recent Developments, supra note 5, at 234, n 92.

69    In re Letter of Request From the Crown Prosecution Service of the United Kingdom (Ward), 879 F. 2d 686 (D.C. Cir. 1989). For a comment on this case, see Peter D. Troobofs & Bradford L. Smith, supra note 5, at 929. I submitted an expert opinion to the same effect in this case.

70    See supra text accompanying notes 32-41.

71    It may be argued that a disadvantage of conditioning recourse to § 1782 on making discovery available to the opposing party is that it may need an inquiry into what discovery is available under foreign law. This argument must fail, because the court can impose the condition, regardless of whether foreign law permits the discovery.

72    See supra text accompanying notes 46-56.

73    This intention may be found in the statutory text by reading § 1782 as requiring that the Federal Rules of Civil Procedure apply broadly to all steps that are necessary in order to achieve the production of the evidence.

Case: 15-15355    Date Filed: 01/22/2016    Page: 69 of 69

AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN..., 25 Syracuse J. Int'l L....

74    See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970); Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969).

75    The legal interest of adverse parties to receive notice of the application was underlined by Judge Leval, in the Sarrio case, who affirmed their standing to oppose recourse to § 1782. In re Sarrio S.A., 1995 WL 598988 (S.D.N.Y. Oct. 11, 1995) rev'd 119 F. 3d 43 (2d Cir. 1997). To the same effect, In re Letter Rogatory from Justice Court, Montreal, 523 F. 2d 562 (6th Cir. 1975).

76    The assessment of attorney's fees can be justified on the ground of reckless disregard of constitutional guarantees. For support of the notion that violation of constitutional norms provides a special argument for assessing attorney's fees, see Serrano v. Priest, 20 Cal. 3d. 25, 141 Cal. Rptr. 315, 569 P. 2d. 1303 (1977). But cf. Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975), recognizing, in dictum, that imposition of attorney's fees may be proper to punish vexatious conduct.

77    But it may be required by the procedural or ethical rules prevailing in the foreign or international tribunal.

78    See supra text accompanying notes 74-75.

79    See Smit, International Litigation, supra note 4, at 1033-34.

80    The law of that place might well regard the adverse party as having a protected interest in precluding disclosure of confidential information. Significantly, Judge Leval ruled that, under American law, the adverse party could not assert the privilege.

81    Restatement (Second), Conflict of Laws §139 (2) (1971).

82    If a privilege were recognized in such circumstances, an easy way of frustrating discovery would be to transmit the documents to one's attorney.

83    See supra text accompanying notes 80-82.

84    Many foreign countries invoke sovereignty as an obstacle to discovery in aid of foreign litigation. See Hans Smit, International Cooperation in Litigation: Some Observation on the Role of International Law and Reciprocity, 9 Neth. Int'l. L. Rev. 137 (1962).

85    See supra note 77. See also Jack B. Weinstein, Recognition in the United States of the Privileges of Another Jurisdiction, 56 Colum. L. Rev. 535 (1956).

86    See supra text accompanying note 55.

87    Société Nationale Industrielle Aerospatiale v. U.S. District Court of Southern District Iowa, 482 U.S. 522, 107 S. Ct. 2542, 96 L. Ed 2d 461 (1987).

88    However, the Supreme Court stressed the desirability of the district courts' being especially concerned about the comity due to foreign countries.

89    Indeed, the only amendment that might arguably deserve consideration is one that would make explicit that the Federal Rules of Civil Procedure apply to all procedures under § 1782. See supra text accompanying note 73. The only amendment made to § 1782 since enactment of the 1964 revision consists of addition of the words "..., including criminal investigations before formal accusation." in the first sentence of Subsection (a). This amendment was both unnecessary and undesirable: unnecessary, because the leading appellate court decision on the issue had already held in favor of assistance in such investigations (see supra text accompanying note 73); and undesirable, because this unneeded particularization may lead to the argument that other similar situations are not covered by § 1782 (for an example of such a situation, see supra text accompanying notes 21-22).

25 SYRJILC 1

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

ADD-15